15 P.3d 533 (2000)
331 Or. 398
In re Complaint as to the CONDUCT OF Kenneth Miles JAFFEE, Accused.
(OSB 98-40, 98-123, 98-128, 98-132; SC S35948; S47246)
Supreme Court of Oregon, En Banc.
Submitted on the Record and Briefs April 14, 2000.
Decided December 14, 2000.
*534 Jane E. Angus, Assistant Disciplinary Counsel, Oregon State Bar, Lake Oswego, and Richard D. Adams, Bar Counsel, Grants Pass, filed the briefs for the Oregon State Bar.
No appearance for accused.
PER CURIAM.
These two lawyer discipline proceedings, which involve the same lawyer, have been combined for purposes of review and decision. The proceedings are before this court on briefs submitted by the Oregon State Bar and on the record made before two trial panels of the Disciplinary Board. See ORAP 11.25(3)(b) (permitting submission of matter to court on that basis when accused lawyer fails to file petition or brief within time allowed). In each proceeding, the trial panel determined that the accused had committed serious breaches of the disciplinary rules and that he should be disbarred. Because of the severity of that sanction, review by this court is automatic. BR 10.1. On de novo review, ORS 9.536(2), BR 10.6, we agree with the trial panels that the accused violated the disciplinary rules and that he should be disbarred.
The first proceeding against the accused arises out of an October 1998 formal complaint that alleged two unrelated causes of complaint. The second proceeding arises out of a July 1999 formal complaint that alleged two additional unrelated causes of complaint. We consider the four causes of complaint, *535 and the episodes on which they are based, in turn.

PRACTICING WHILE SUSPENDED
The Bar alleged, in its October 1998 amended formal complaint, that the accused was suspended from the practice of law on April 11, 1997, for failure to make an installment payment to the Professional Liability Fund (PLF). The Bar further alleged that the accused performed legal services for certain designated clients during the ensuing period of suspension, i.e, between April 11, 1997, and May 1, 1997, and that, in doing so, the accused falsely represented to clients and courts that he was authorized to practice law. The Bar asserted that that conduct violated three disciplinary rules and one statute: (1) DR 1-102(A)(3) (conduct involving dishonesty, fraud, deceit, or misrepresentation); (2) DR 1-102(A)(4) (conduct prejudicial to the administration of justice); (3) DR 3-101(B) (lawyer shall not practice in jurisdiction when doing so would violate regulations of profession in that jurisdiction); and (4) ORS 9.160 (only active members of Bar may practice law and represent themselves as qualified to practice law).
On de novo review, we find that the Bar has established all four of the violations charged in connection with this episode by the requisite clear and convincing evidence. See BR 5.2 (setting that standard of proof). It is undisputed that the accused was suspended from the practice of law and that he practiced law during that period. In addition, and although the accused denied it, the evidence supports a conclusion that the accused was aware of the suspension at the time that it occurred.[1] We therefore find that the accused violated ORS 9.160, which provides that "no person shall practice law or represent that person as qualified to practice law unless that person is an active member of the Oregon State Bar." We also find that, by continuing to practice law in Oregon after he was suspended, the accused violated DR 3-101(B), which provides that a lawyer "shall not practice law in a jurisdiction where to do so would be in violation of regulations of the profession in that jurisdiction."
The accused also violated DR 1-102(a)(3), which provides that a lawyer shall not "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." "Misrepresentation," under that rule, can include an intentional failure to disclose a material fact. In re Hiller, 298 Or. 526, 532, 694 P.2d 540 (1985). We have noted in the past that a lawyer's eligibility to practice law is material in the context of an attorney-client relationship and that a lawyer who renders legal services to a client while intentionally failing to disclose his or her suspended status violates the rule. See In re Whipple, 320 Or. 476, 487, 886 P.2d 7 (1994) (illustrating rule). Under that precedent, the accused's conduct involved misrepresentation to the clients whom he purported to serve during the time that he was suspended. The accused also violated DR 1-102(A)(3) by implicitly representing to the courts before whom he appeared and to the opposing counsel against whom he appeared that he was eligible to practice law.
Finally, this court has held that a misrepresentation made by a lawyer to a court may be prejudicial to the administration of justice within the meaning of DR 1-102(A)(4). See In re McKee, 316 Or. 114, 126, 849 P.2d 509 (1993) (so stating). In that case, this court indicated, however, that such a misrepresentation must involve "prejudice," i.e., either (1) repeated conduct causing some harm to the administration of justice; or (2) a single act causing substantial harm to the administration of justice. Id. Here, the accused's conduct involved prejudice of the first sort, i.e., he repeatedly appeared before a number of courts and administrative bodies during his suspension. We agree with the Bar that the *536 accused's conduct was prejudicial to the administration of justice and, therefore, violated DR 1-102(A)(4).

FAILURE TO OBEY ORDERS OF UNITED STATES DISTRICT COURT
The Bar's second cause of complaint in its October 1998 amended formal complaint alleged:
"On or about September 13, 1991, judgment was entered in favor of the United States of America against the Accused in the amount of $13,625, in the matter of United States of America v. Kenneth M. Jaffee, Case No. 90-6431-HO (hereinafter, `Court Action').
"On or about February 27, 1997, the court entered an order requiring the Accused to appear for a judgment debtor examination in the Court Action on April 28, 1997. The Accused was served in the manner provided by law and received a copy of the order.
"On or about April 25, 1997, the U.S. Attorney's Office contacted the Accused to determine if he would appear for the judgment debtor examination scheduled for April 28, 1997. The Accused advised that he did not plan to do so, but would try to provide the required documents and other information.
"As a result of the Accused's April 25, 1997, communication, the judgment debtor examination in the Court Action was rescheduled for July 14, 1997. The Accused was served with a copy of the Order Rescheduling the Judgment Debtor Examination on June 18, 1997. The Accused failed to produce the required documents and information and failed to appear as required by the court's order.
"On or about July 18, 1997, the court entered an order in the Court Action, requiring the Accused to appear on August 14, 1997, to show cause why a warrant for his arrest should not be issued and why he should not be held in contempt of court. The Accused was served with the Order to Show Cause on July 25, 1997. The Accused failed to appear and a warrant for his arrest was issued by the court.
"Between February 1997 and January 1998, the accused failed to produce documents and information as ordered by the court in the Court Action."
Because the accused did not respond to that second cause of complaint, the trial panel entered an order of default. For purposes of review, we deem the facts alleged in the Bar's amended complaint that pertain to the second cause of complaint to be true. See In re Bourcier, 322 Or. 561, 564, 909 P.2d 1234 (1996) (when accused does not answer and makes no other appearance, court deems facts alleged in Bar's formal complaint to be true).
The trial panel found that the accused's conduct violated DR 7-106(A) and DR 1-102(A)(4). We agree.
DR 7-106(A) provides:
"A lawyer shall not disregard or advise lawyer's client to disregard * * * a ruling of a tribunal made in the course of a proceeding[,] but the lawyer may take appropriate steps in good faith to test the validity of such rule or ruling."
The Bar's allegations show that the accused was aware that the United States District Court repeatedly had ordered him to appear and to produce certain information, and that he had not done so. By knowingly and intentionally disregarded several rulings of a court, the accused violated DR 7-106(A).
As noted, DR 1-102(A)(4) prohibits lawyers from engaging in conduct "prejudicial to the administration of justice." Conduct falls within that proscription if it causes harm either to the procedural functioning of a legal proceeding or to the substantive interests of a party in the proceeding. In re Haws, 310 Or. 741, 746-47, 801 P.2d 818 (1990). The conduct at issue caused substantial harm of both kinds. It placed an unnecessary burden on the judicial systemso much so that the district court ultimately issued an order for the accused's arrest. It also harmed the substantive interests of the opposing party, the United States government, in that it forced the government to expend a great deal of time and energy investigating and collecting its judgment *537 against the accused. The accused's conduct violated DR 1-102(A)(4).

CRIMINAL INTERFERENCE WITH PEACE OFFICERS
The Bar's July 1999 formal complaint alleged that the accused was arrested on July 8, 1998, and subsequently was convicted on a charge of Interfering with a Peace Officer, a violation of the Medford Municipal Code. The trial panel found that the conduct that led to that arrest and conviction was professional misconduct under DR 1-102(A)(2). DR 1-102(A)(2) provides that it is professional misconduct to "[c]ommit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law."
There is no question that the accused was convicted on December 4, 1998, of the offense of Interfering with a Peace Officer under the Medford Municipal Code § 5.175. That ordinance provides, in part:
"(2) No person shall refuse to leave the area of an arrest, custody, or stop * * * after being directed to leave the area by a person known to him to be a peace officer."
The trial panel summarized the facts supporting the conviction as follows:
"On July 11, 1998, Medford Police Officers Lytle and Young stopped a motor vehicle driven by a Kim Pemberton. Ms. Pemberton didn't have a driver's license and was uninsured. During the course of the investigation, Officer Lytle discovered that Ms. Pemberton was driving with a suspended license under circumstances that made her subject to arrest. Officer Lytle took Ms. Pemberton into custody. The location of the traffic stop was within a few blocks of the home that Ms. Pemberton shared with the Accused at the time.
"(2) During the course of the investigation with Ms. Pemberton, the Accused arrived on foot and `walked right up into the middle' of the situation, which was `very threatening to the officers.' He had his fists `clenched down at his sides.' The Accused came to within approximately 6 inches of the officers and began demanding to speak to Ms. Pemberton and to question the actions of the police officers. The officers were in uniform. Ms. Pemberton was in custody at the time and was handcuffed. The Accused's behavior caused the officers to become concerned `for our own safety.' Officer Young testified that he thought the Accused might create an `assaultive situation' and that `I believed this was going to turn into a physical confrontation by his demeanor.' The Accused was `very close in [the officers'] faces['s]. The officers ordered the Accused approximately ten times to `step back,' to `get away,' and to `stop.' The accused heard the officers repeated commands. He refused to comply."
(Citations to transcript omitted.)
Although the fact and circumstances of the criminal act are proven, the question remains whether that act is of the sort that reflects adversely on the accused's "fitness to practice law."[2] Not every criminal act reflects adversely on a lawyer's "fitness to practice law" within the meaning of DR 1-102(A)(2). As this court noted in In re White, 311 Or. 573, 589, 815 P.2d 1257 (1991), "[t]here must be some rational connection other than the criminality of the act between the conduct and the actor's fitness to practice law." White identified a number of "pertinent considerations" with respect to whether a criminal act adversely reflects on a lawyer's fitness to practice law:
"[T]he lawyer's mental state; the extent to which the act demonstrates disrespect for the law or law enforcement; the presence or absence of a victim; the extent of actual or potential injury to a victim; and the presence or absence of a pattern of criminal conduct."
Id. Applying those factors, the accused certainly demonstrated a "disrespect for * * * law enforcement." The accused's physical intrusion into Pemberton's arrest also threatened to turn an unpleasant but peaceful act of law enforcement into a violent confrontation, with the officers as potential victims. There was no actual physical injury, and no *538 pattern of criminal conduct, but lawyers are supposed to respect and vindicate the traditional process of reviewing the propriety of police actions in court, not attempt to circumvent those processes by initiating confrontations in the street. The accused's acts reflect directly on his fitness to practice law. We find that he violated DR 1-102(A)(2).

AUGUST 1998 TRAFFIC STOP
The Bar alleged, and the evidence shows, that, during a routine traffic stop on August 21, 1998, the accused supplied the police with incorrect information about his address and about whether he had liability insurance coverage. Specifically, the accused verified that he lived at the address listed on his driver license when he did not, in fact, live there, and he told the police that his vehicle was covered under his father's motor vehicle insurance policy, when it was not. Based on that incident, the accused was convicted of the crimes of Giving False Information to a Police Officer, ORS 807.620, and Giving False Information about Liability Insurance to a Police Officer, ORS 806.055.[3]
The Bar contends that the accused's conduct violated DR 1-102(A)(3), because it involved "dishonesty, fraud, deceit, or misrepresentation." We agree. Conviction under both ORS 806.620 and ORS 807.055 required the trier of fact to find that the accused "knowingly" gave "false" information to a police officer. At the very least, the convictions support a conclusion that the accused's conduct was dishonest.
The accused suggested, in his testimony before the trial panel, that his statement that he was covered by his father's insurance "technically" was correct[4] and that the police officer never asked whether the address on his driver license was correct. However, as the trial panel noted, that testimony is contradicted by the father's statement that the accused was not covered by his insurance and by the police officer's trial court testimony that he did ask the accused if the listed address was correct. Under DR 1-102(A)(3), "dishonesty" and "misrepresentation" can arise out of a failure to disclose a material fact. In re Leonard, 308 Or. 560, 569, 784 P.2d 95 (1989). The evidence shows that the accused knew that he did not live at the address stated on his license, that he had not obtained insurance for the vehicle that he was driving, that he had not discussed the vehicle or insurance for the vehicle with his father, and that he had no reason to know or believe that the vehicle in fact was covered by his father's insurance. Under those circumstances, the accused's representations that he lived at the listed address and that the vehicle was insured were misrepresentations within the meaning of DR 1-102(A)(3).

FAILURE TO COOPERATE WITH THE BAR
Also in its July 1999 formal complaint, the Bar alleged that the accused repeatedly failed to respond to its requests for explanations of the incidents described in the first and second causes of complaint, and that the accused failed to respond to requests by the Jackson/Josephine County Local Professional Responsibility Committee (LPRC) to contact its investigator and schedule an appointment to discuss the complaint. In his answer, the accused admitted "for lack of any knowledge to the contrary, the allegations of actions by the various Bar entities, but denie[d] that he failed to respond to the request for explanation." The trial panel concluded that the accused had admitted to some of the instances of unresponsiveness that the Bar had alleged and found that the accused had violated DR 1-103(C).
[10] DR 1-103(C) provides:

*539 "A lawyer who is the subject of a disciplinary investigation shall respond fully and truthfully to inquiries from and comply with reasonable requests of a tribunal or other authority empowered to investigate or act upon the conduct of lawyers, subject only to the exercise of any applicable right or privilege."
Even if a lawyer ultimately chooses to cooperate with an investigation, his or her initial failure to cooperate may violate the rule. In re Vaile, 300 Or. 91, 101, 707 P.2d 52 (1985) (illustrating proposition; In re Schaffner, 325 Or. 421, 425, 939 P.2d 39 (1997) (same).
We find clear and convincing evidence that the accused repeatedly failed to comply with reasonable requests by the Bar and the LPRC. For example, and although the accused eventually did submit an explanation of his July 22, 1998, arrest to the Bar, he did so only after two deadlines set by the Bar had passed and after the Bar had submitted the matter to the LPRC for investigation. Similarly, the accused ignored two letters from an LPRC investigator who wrote to the accused, asking him to call and set up an appointment to discuss his conduct. The requests from the Bar (for an explanation) and the LPRC (for contact) were reasonable and did not require the accused to waive any right or privilege. We conclude that the accused violated DR 1-103(C) as charged in the Bar's July 1999 formal complaint.

SANCTION
In determining an appropriate sanction for a lawyer's ethical violations, we begin with the analytical framework set out in the American Bar Association's Standards for Imposing Lawyer Sanctions (1991) (Amended 1992) (ABA Standards). Under that framework, we arrive at an initial presumptive sanction based on: (1) the ethical duty violated, (2) the lawyer's mental state; and (3) the actual or potential injury caused. We then adjust that presumptive sanction based on a fourth factor, the presence of aggravating or mitigating circumstances. See ABA Standard 3.0 and at ABA Standards 5-6. Finally, we consider whether that adjusted sanction is consistent with Oregon case law. In re Huffman, 328 Or. 567, 587-88, 983 P.2d 534 (1999).

DUTIES VIOLATED
The accused violated duties to the public, the legal system, the profession, and his clients. The community has a right to expect lawyers to live up to the highest standards of honesty and integrity. Lawyers fail in their duty to the public when they engage in dishonest conduct and in their duties to the public and the legal system when they engage in conduct prejudicial to the administration of justice.

MENTAL STATE
The ABA Standards recognize three mental states: intent, knowledge, and negligence. A lawyer acts with "intent" if he or she acts with the conscious objective or purpose of accomplishing a particular result. A lawyer acts with "knowledge" if he or she is consciously aware of the nature or attendant circumstances of the conduct, but does not have a conscious objective of accomplishing a particular result. ABA Standards at 7.
The evidence establishes that the accused acted intentionally when he practiced law while suspended and when he interfered with law enforcement authorities. The evidence further establishes that the accused acted knowingly when he disregarded orders of the United States District Court and requests for information from the Bar and LPRC investigators, and when he provided false information about his address and motor vehicle insurance to the police.

INJURY
The ABA Standards recognize both actual and potential harm. "Potential harm" is harm to a client, the public, the legal system, or the profession that reasonably is foreseeable at the time of the lawyer's misconduct and that probably would have resulted but for some intervening factor or event. ABA Standards at 7. The accused caused potential injury to his clients by performing legal services for them without the required malpractice insurance. The accused also caused potential injury to the *540 legal system by practicing law when he was not authorized to do so.
The accused's conduct also caused actual harm. He harmed the legal system by interfering with police officers as they attempted to perform their duties. He placed an unnecessary burden on the judicial system by failing to respond to court orders. He diminished the reputation of all members of the legal profession by repeatedly engaging in criminal conduct and by flouting orders of a federal court.
Based on the foregoing, we find that the following standards are relevant to the disciplinary violations arising out of the accused's practice of law while suspended:
"7.0 Violations of Duties Owed to the Profession
"7.1 Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.
"7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession and causes injury or potential injury to a client, the public, or the legal system."
The following standard is relevant to the disciplinary violations arising out of the accused's failure to respond to the orders of the United States District Court:
"6.2 Abuse of the Legal Process
"* * * * *
"6.22 Suspension is appropriate when a lawyer knowingly violates a court order or rule, and there is injury or potential injury to a client or a party, or interference or potential interference with a legal proceeding."
Finally, the following standards are relevant to the disciplinary violations that relate to the accused's criminal convictions:
"5.1 Failure to Maintain Personal Integrity.
"Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving the commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respect, or in cases with conduct involving dishonesty, fraud, deceit or misrepresentation:
"5.11 Disbarment is generally appropriate when:
"(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, * * *; or
"(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice law.
"5.12 Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the fitness to practice law."
Based on the factors of duties violated, mental state of the accused, and injuries caused, our initial determination is that, aggravating and mitigating circumstances aside, either a lengthy period of suspension or, possibly, disbarment, would be the appropriate sanction for this particular combination of disciplinary violations.

AGGRAVATING AND MITIGATING CIRCUMSTANCES
There is no evidence in the record of any mitigating circumstances. However, the record suggests a number of aggravating circumstances. First, the rule violations are based on four separate episodes of misconduct that, when taken together, demonstrate a pattern of misconduct. ABA Standard 9.22(c), (d). Second, the accused has an extensive prior record of discipline. ABA Standard 9.22(e). In 1986, while practicing in California, the accused was suspended from the practice of law for one year and placed on probation for one year for neglect of client matters and other unprofessional conduct.
*541 In 1989, the accused again was suspended from practice in California after he disclosed to the California State Bar that he had been convicted in Oregon of manufacturing a controlled substance, ORS 475.992(1)(a), a Class A felony. Also while practicing in California, the accused was jailed for contempt of court, relating to his presentation of the defense in a criminal trial. On another occasion, he was fined by a court under similar circumstances.[5] Third, the accused has substantial experience in the practice of law, having been admitted to practice in California in 1975, and in Oregon in 1994. ABA Standard 9.22(i). Fourth, his criminal conduct in supplying false information to the police appears to have arisen out of dishonest or selfish motives. ABA Standard 9.22(b).
In view of those aggravating factors, we conclude that suspension would be inadequate and that disbarment is the appropriate sanction for the accused's misconduct. Having made that determination, we turn to whether imposing that sanction is consistent with Oregon case law. Nothing in that case law dissuades us from our view that disbarment is the appropriate sanction in this case.
The accused is disbarred, effective 60 days from the date of the filing of this decision.
NOTES
[1] In that regard, we find the following evidence to be significant: (1) the Bar repeatedly warned the accused that he would be suspended effective April 11, 1997, if he did not pay the PLF assessment; (2) on or around April 11, 1997, the Bar sent documents to the accused that would have notified him that the suspension had occurred; and (3) when, on April 24, 1997, the accused was confronted by a judge who had received notice of the suspension, the accused responded in a manner that led that judge and another lawyer who heard the exchange to believe that the accused knew that he was suspended.
[2] Most cases under that rule concern criminal acts that demonstrate dishonesty. See In re White, 311 Or. 573, 588, 815 P.2d 1257 (1991) (noting that fact). This one does not.
[3] ORS 806.055(1) provides:

"A person commits the offense of giving false information about liability insurance to a police officer if the person knowingly gives false information about the person's motor vehicle liability insurance coverage to any police officer who is enforcing motor vehicle laws."
ORS 807.620(1) provides:
"A person commits the offense of giving false information to a police officer, if the person knowingly uses or gives a false or fictitious * * * address * * * to any police officer who is enforcing motor vehicle laws."
[4] The accused testified, specifically, that he previously had used a vehicle that was covered by his father's insurance and that the policy allowed for coverage of a replacement vehicle.
[5] The foregoing history prompted the Oregon State Bar to contest the accused's application for admission to that Bar and also prompted this court to reject his application on one occasion before his eventual admission. In re Jaffee, 319 Or. 172, 874 P.2d 1299 (1994).