Argued and submitted January 4, accused suspended from practice of law
for six months, commencing 60 days from effective date of this decision
June 8, reconsideration denied August 15, 2006

## In re Complaint as to the Conduct of

# LAUREN J. PAULSON,
*Accused.*

## (OSB No. 01-100; SC S52465)

136 P3d 1087

Lauren J. Paulson, Aloha, argued the cause and filed the briefs on his own behalf.

Mary Anne Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

Before De Muniz, Chief Justice, and Gillette, Durham, Riggs, Balmer, and Kistler, Justices.*

PER CURIAM

---

* Carson, J., did not participate in the consideration or decision of this case.

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged the accused with violating Code of Professional Responsibility Disciplinary Rule (DR) 1-102(A)(4), a rule prohibiting conduct that is prejudicial to the administration of justice.[1] A trial panel of the Disciplinary Board concluded that the accused's conduct had violated DR 1-102(A)(4) during a bankruptcy proceeding, but that his conduct during a state court proceeding in which he had represented the same clients had not. The trial panel suspended the accused from the practice of law for 45 days. The accused now seeks review of that decision pursuant to BR 10.1 and ORS 9.536(1). On review, the Bar argues that the trial panel erred in concluding that the accused's conduct in the state court proceeding did not violate DR 1-102(A)(4) and that the trial panel should have imposed a longer period of suspension.

We review the trial panel's decision *de novo*. ORS 9.536(3); BR 10.6. The Bar must establish the alleged misconduct by clear and convincing evidence. BR 5.2. "Clear and convincing evidence" means evidence establishing that the truth of the facts asserted is highly probable. *In re Johnson*, 300 Or 52, 55, 707 P2d 573 (1985). For the reasons that follow, we agree with the trial panel's conclusion that the accused's actions during his client's bankruptcy proceeding violated DR 1-102(A)(4). However, we disagree with the trial panel's conclusion regarding the accused's conduct during the state court proceeding. Instead, we conclude that the accused's conduct during the course of that proceeding also violated DR 1-102(A)(4). We further conclude that the appropriate sanction is a six-month suspension from the practice of law.

## I.   FACTS AND PROCEDURAL BACKGROUND

The relevant facts are, for the most part, undisputed. In 1997, Jerry and Phyllis Nutt, a retired couple, purchased a

---

[1] The Oregon Rules of Professional Conduct became effective January 1, 2005. The conduct at issue in this proceeding occurred before that date, and we therefore apply the Oregon Code of Professional Responsibility.

modular home for installation in Hebo, Oregon. The Nutts contacted Mark Gensman, a mortgage broker with Business Resource Group (BRG), for construction financing. Gensman met with the Nutts and arranged for a construction loan to purchase and install the modular home. The terms of the loan required payment within four months, at which point the Nutts were to obtain permanent financing on their home. The Nutts encountered problems with delays and defects in the installation of their modular home, however, and the construction loan deadline expired.

On October 20, 1997, the Nutts sought legal advice from the accused regarding the acquisition of permanent financing. The accused reviewed the Nutts' loan documents and advised them to pursue a claim against Gensman and their construction lender. The Nutts expressed a desire simply to finish their home and indicated their reluctance to get involved in extensive litigation. Nevertheless, as difficulties with the installation of the home continued, the Nutts and the accused agreed to take legal action against the parties involved in financing and constructing the home. Specifically, the complaint alleged that Gensman, BRG, and the other parties involved had failed to make various disclosures relating to the terms of the loan pursuant to the Truth in Lending Act (TILA), the Oregon Lender Law (OLL), and the Oregon Unfair Trade Practices Act (UTPA), and that those nondisclosures also constituted fraud.[2] The resulting complaint alleged seven different claims and damages totaling $500,000. The complaint also sought an unspecified amount in punitive damages.

Steven Berman and John Dunbar, the lawyers representing Gensman and BRG, evaluated the Nutts' complaint and concluded that, at most, the Nutts might be entitled to recover a portion of their loan fees. Furthermore, Berman and Dunbar concluded that the complaint was vulnerable to attack on several grounds. On June 3, 1998, Berman wrote to the accused, requesting a meeting to discuss the issues in the case. The accused failed to respond. Two weeks later, Berman again wrote to the accused,

---

[2] The complaint failed, however, to state the manner in which those nondisclosures had harmed the Nutts.

addressing the complaint's perceived deficiencies. Several days later, the accused responded by letter, stating that he was "feeling real pouty" and that he was "sending a copy of this letter to my clients so they know I am on the ball and you're not." Upon receiving the letter, Berman attempted to contact the accused by telephone, but the accused did not return the call. Berman then advised the accused that he would move to correct what he perceived to be the complaint's deficiencies.

On August 11, 1998, Berman spoke with the accused and requested a damages estimate. Although the accused assured Berman that he would provide an estimate within one week, he failed to do so. Instead, the accused notified Berman that he intended to apply for an order of default against Berman's and Dunbar's clients.

On September 4, 1998, Berman served a request for admissions and a request for production of documents. In addition, Berman again asked that the accused provide an estimate of damages, as well as a settlement proposal. The following day, the Nutts sent the accused a letter that estimated their damages. The Nutts identified approximately (1) $5,000 in construction-related damages; (2) $6,000 in damages that they felt had been caused by Gensman; (3) $25,000 in "consequential damages" due to the delay in construction; and (4) $65,000 in "consequential damages" from Gensman and BRG for "undue stress, frustration, and possible loss of health."

The accused did not respond to Berman's settlement suggestion until October 16, 1998, when he wrote a letter demanding approximately $15,000 in "actual damages" and $20,000 in "general damages." In that letter, the accused indicated that, if the Nutts' "demand for settlement is not agreed to within 20 days[,] * * * then there will be no further negotiations" and that a "counter-offer will immediately terminate negotiations."

Meanwhile, the accused had failed to respond to Berman's September 4, 1998, request for production, had failed to request an extension to respond, and had failed to respond to Berman's letters attempting to confer with him. Finally, on October 15, 1998, Berman moved for attorney

fees, to compel production of documents, and, pursuant to ORCP 21 (hereinafter, "Rule 21"), moved to correct the deficiencies in the complaint. A hearing on those motions was scheduled for November 12, 1998.

On November 3, 1998, Berman served a second request for production of documents. The accused failed to respond to that request. He also failed to inform the Nutts that the request had been made or to ask them to provide the requested documents.

Several days later, the accused received a letter from Berman indicating that the Nutts would be liable for attorney fees should Berman prevail on the merits of the litigation.

On November 10, 1998, the accused responded to Berman's Rule 21 motion and his motion to compel. In the response to the motion to compel, the accused offered the Nutts' poor health as justification for the failure to produce the requested documents. The accused included an affidavit, which represented that Phyllis Nutt recently had undergone complex surgery and that Jerry Nutt was suffering from a chronic "health situation." The accused, however, had not asked the Nutts to compile any documents until after Berman had moved to compel.

On November 12, 1998, the trial court granted Berman's motion to compel and struck the complaint's damage allegations under the TILA and the OLL. The court ordered the accused to make a "more definite and certain * * * factual statement as to how plaintiff was injured" by the alleged violations. The court also struck the claim for punitive damages, because the accused had failed to follow the procedures required for seeking punitive damages.

On November 17, 1998, Berman made yet another settlement overture, again reminding the accused of the Nutts' possible liability for attorney fees. Berman offered to settle the case for $2,000 and to waive Gensman's right to demand attorney fees. The accused rejected Berman's offer, stating that the Nutts had authorized him to reject "this nuisance offer." The accused stated that there would be "no

counter-offer" and that he would "not engage in any further negotiations."

On November 19, 1998, Berman deposed the Nutts. Prior to the deposition, the accused had informed Berman that Gensman's conduct had exacerbated the Nutts' health issues. Berman inquired about those health issues during the deposition. The accused, however, refused to allow either of the Nutts to answer any health-related questions. Following the deposition, the Nutts were upset by what they perceived as the accused's confrontational style and by his refusal to allow them to answer questions about their medical conditions.

On December 7, 1998, Berman proposed that the parties participate in a pretrial settlement conference. Although the Nutts appeared eager to resolve their legal situation, the accused ignored Berman's proposal.

On December 10, 1998, the accused filed an amended complaint. On December 16, 1998, Berman wrote to the accused and expressed his concerns that the amended complaint had not alleged any factual basis for the damages claimed under the TILA and the UTPA. Berman also pointed out that the accused had not repleaded the fraud claims, as the trial court had ordered.

On December 31, 1998, Berman again wrote to the accused. The accused had not responded to the second request for production of documents or to Berman's December 16, 1998, letter. Berman asked for the requested documents and for an indication as to whether the accused intended to remedy the deficiencies in the amended complaint. The accused did not respond.

On January 20, 1999, Berman filed a Rule 21 motion attacking the amended complaint. Berman also moved for partial summary judgment and for attorney fees. The summary judgment motion contested the Nutts' right to damages in three of the four claims for relief alleged against Gensman in the amended complaint.

The accused opposed those motions by filing an affidavit from the Nutts, which claimed that the Nutts had been "harmed a lot financially" and that Gensman's conduct had

caused them to suffer "emotional and physical stress that ultimately caused physical ramifications."

On March 15, 1999, 11 months after filing the action, the accused served plaintiffs' first request for production of documents. The accused previously had served no other discovery requests. Trial was set for July 1, 1999.

On April 14, 1999, the accused wrote to Berman and informed him that, on April 15, 1999, he intended to appear *ex parte* in an attempt to reinstate the Nutts' claims against another party, who had been dismissed for lack of service. To avoid any delay of the trial, Berman appeared to oppose the motion. Ultimately, the accused did not offer his motion.

On April 15, 1999, Berman responded to the accused's request for production of documents. Berman objected to most of the requests as overbroad and unduly burdensome. Berman did offer to produce documents relating to the Nutt transaction subject to a protective order, after the trial court ruled on the pending motions. The accused did not attempt to confer with Berman regarding that response.

Berman's motion for partial summary judgment was argued in five separate hearings. On March 19, 1999, the first of those hearings, the trial court granted Berman's motion on the Nutts' TILA claim, ruling that TILA did not apply to Gensman and BRG. At the second hearing, the court granted, for the most part, Berman's motion on the Nutts' OLL claim, ruling that Gensman had made the proper disclosures, but left open whether Gensman's disclosures concerning the Nutts' ability to rescind the transaction had satisfied the OLL. The court also noted that the accused had failed to plead any damages under the Nutts' UTPA and again had failed to follow the proper procedures to seek punitive damages. The accused agreed with the court that he needed to "rush off and amend [his] pleadings." However, the accused did not attempt to amend the complaint again until almost five months later.

On April 20, 1999, the accused brought the Nutts to the courthouse. The accused hoped to obtain a default judgment against American Modular Homes, who had not appeared as a party in the litigation. The accused had failed,

however, to obtain a default order from the presiding judge, as required by trial court rule. Nevertheless, the accused asked the assigned judge to sign the order of default. The judge signed the order, after informing the accused of the procedural defect and stating that the order may not be valid. The judge then invited the accused to present a *prima facie* case on the issue of damages. In response, the accused told the judge that the Nutts could "articulate [that issue] a lot better than [he could]." Under oath, Jerry Nutt testified that he had spent $6,000 on repairs and thought that he may have incurred additional expenses for plumbing and cabinetry ranging between $5,000 and $10,000.

Based on that information, the judge offered to sign a judgment against American Modular Homes for $20,000. The judge also allowed the Nutts to submit additional evidence of damages. As a result, the accused had Jerry Nutt sign an affidavit concerning damages and submitted that affidavit to the trial court with a proposed form of judgment for $700,000 in economic damages, plus $14,655 in attorney fees. Upon receiving that affidavit, the judge informed the accused that the affidavit "stated only conclusions and [would] not be relied upon" to determine damages.

Meanwhile, at the third summary judgment hearing on Berman's motion, the trial court ruled that the accused had not offered sufficient evidence of fraud and granted summary judgment to Gensman on that claim. At that time, Dunbar made another settlement overture to the accused, stating that the Nutts' "remaining claims are not strong ones, and the most you can hope to achieve * * * is a few hundred dollars[.] * * * [The Nutts] are at enormous risk for a sizable fee award." The settlement offer included payment of $2,500 and a waiver of Gensman's right to collect attorney fees.[3]

On June 9, 1999, at the fourth summary judgment hearing on Berman's motion, the trial court dismissed most of the Nutts' UTPA claim and all the fraud claims. After that hearing, Berman and Dunbar made another settlement offer. They noted that the Nutts' case against Gensman had diminished to a $200 UTPA claim and that the Nutts were at risk

---

[3] As of that date, Gensman's attorneys fees totaled almost $23,000.

for a sizable attorney fee award, and they offered to settle for $1,000 and to waive Gensman's right to collect attorney fees. The accused did not inform the Nutts of that settlement offer. Neither did the accused inform the Nutts that they could be held liable for attorney fees.

On July 1, 1999, the Nutts appeared in court believing that they were going to try their case to a jury. The accused had not informed them that only the $200 UTPA claim against Gensman had survived summary judgment and that the scheduled proceeding was a hearing, not a trial on the merits of their claims. The accused assured the Nutts that they would win easily and that they need not worry about attorney fees. Because the accused had failed to remedy the deficiencies in the complaint and could not articulate a theory of damages, the trial court dismissed the Nutts' remaining claims.

A hearing for entry of a final judgment in favor of Gensman occurred on August 23, 1999. At that hearing, the accused argued that the Nutts had been treated unfairly and accused two judges of denying the Nutts a full and fair hearing. After that hearing, the trial court entered a judgment against the Nutts that awarded Gensman and BRG attorney fees and costs, in an amount to be determined at a later date.

On September 2, 1999, the accused moved for a new trial. In that motion, the accused claimed that two of the judges had abused their discretion by denying his prior motions and that Gensman's lawyers had engaged in "judge shopping" and had made misrepresentations to the court. On September 20, 1999, the trial court denied the accused's motion and scheduled the attorney fees hearing for October 13, 1999.

Prior to the October hearing, the accused took no steps to reduce the Nutts' liability for attorney fees, and did not inform the Nutts when the attorney fees petitions would be heard or that they could attempt to limit the fees awarded. Additionally, although the trial court had changed the date of the attorney fee hearing to accommodate the accused, the accused failed to appear at the hearing. On November 4, 1999, the court awarded the full requested amount of attorney fees and an additional $10,000 as enhanced prevailing

party fees, for a total judgment against the Nutts of $61,561.63.

On December 3, 1999, the trial court entered the final judgment awarding attorney fees. On December 7, 1999, the accused moved to disqualify the judge who had entered the December 3 order and to stay enforcement of the judgment.

On December 28, 1999, having persuaded the Nutts to proceed with an appeal, the accused filed a cost bond on appeal and an undertaking signed by the Nutts, stating that they would pay the judgments against them if they did not prevail on appeal. The respondents on appeal objected to those documents as insufficient. On January 25, 2000, the trial court held that the accused's submissions were insufficient to prevent the defendants' lawyers from executing on their clients' judgments. During that hearing, the accused refused to stand when addressing the judge and acted in a manner that the judge described as "extremely bizarre * * * [and] threatening."

The Nutts' bank accounts were thereafter garnished, and, ultimately, they decided to file bankruptcy. The Nutts retained a different attorney, Cary Gluesenkamp, to represent them in their bankruptcy proceeding. Gluesenkamp filed the Nutts' bankruptcy petition on February 25, 2000. The pending appeal of the Nutts' original case was an asset of the bankruptcy estate. In April 2000, the Nutts' bankruptcy trustee asked Berman if he would be interested in settling the appeal. Because the accused was the attorney of record for the appeal, the bankruptcy trustee advised the accused of a possible settlement and explained that the bankruptcy estate did not have the necessary funds to pursue the appeal.

The Nutts told the bankruptcy trustee that they did not wish to pursue the appeal. Accordingly, the trustee accepted Berman's offer of $2,000 to settle the appeal and informed the accused. Without contacting the Nutts or Gluesenkamp, the accused filed an objection to the settlement proposed in the bankruptcy proceeding. In that objection, the accused identified himself as the attorney for the

debtors, although he was not representing the Nutts in the bankruptcy proceeding.

After learning of the accused's objection, Gluesenkamp telephoned the accused, but the accused did not return his calls. On July 20, 2000, Gluesenkamp wrote to the accused, stating that the Nutts were "very adamant" that they did not want to object to the proposed settlement and did not consent to the accused's objection. Gluesenkamp instructed the accused promptly to withdraw his objection.

The accused did not immediately withdraw his objection. Rather, the accused filed a "memorandum" with the bankruptcy court, asking that court to revisit the state court judgments against the Nutts due to "irregularities." The accused also wrote to Gluesenkamp and requested a conference call with him and the Nutts. During that conference call, the Nutts informed the accused that they did not want him to proceed further. The Nutts reiterated that statement in a letter to the accused: "We do not wish to continue any objection to the discharge of our bankruptcy. We request [that] you * * * take the steps required to close out and remove us from any further involvement related to this case." The accused did not respond to the Nutts' letter. Two weeks later, Gluesenkamp again wrote the accused, stating that the Nutts were still "anxiously awaiting" withdrawal of his objection to the proposed settlement.

The accused did not withdraw his objection in the bankruptcy proceeding until August 29, 2000. As to the original state proceeding, the accused informed Gluesenkamp that he would withdraw "at the appropriate point." Months later, however, the accused still had failed to comply with the Nutts' request that he immediately cease activity in the state proceeding. On December 21, 2000, he wrote the Nutts a letter purporting to explain the ongoing status of the case. Finally, on June 11, 2001, the Nutts wrote to the court, stating:

"We do not understand what [the accused] is doing in that [the state proceeding] was dismissed, a bankruptcy that we filed as a result of the decision on that case has been discharged, and an appeal request that [the accused] made was dismissed. We have been asking if all of this action had

been completed and we can finally put it all behind us. Now we have received a copy of correspondence from you to [the accused] and his correspondence to us saying that this fiasco is still not closed * * *. [We] sincerely want to move on and put all of this behind us."

In January 2003, the Bar charged the accused with violating DR 1-102(A)(4) based on the accused's actions in both the Nutts' state court proceeding and the bankruptcy proceeding. Following a hearing in September 2004, a trial panel found that the accused's "improper actions in the bankruptcy proceeding violated DR 1-102(A)(4)." However, the trial panel concluded that the accused's conduct during the Nutts' state court proceeding did not violate DR 1-102(A)(4). The accused petitioned this court for review. The Bar, in its response, also challenged certain aspects of the trial panel decision.

## II.   ACCUSED'S PRELIMINARY ARGUMENTS

As an initial matter, the accused challenges a number of the Bar's factual assertions or otherwise responds to those assertions. We have reviewed all the accused's specific arguments in that regard and conclude that we need not address those arguments because their resolution in the accused's favor would not affect our decision.

## III.   DR 1-102(A)(4) ANALYSIS

We turn to the Bar's allegation that, in both the state court proceeding and the bankruptcy proceeding, the accused's conduct violated DR 1-102(A)(4), which provides:

"It is professional misconduct for a lawyer to * * * [e]ngage in conduct that is prejudicial to the administration of justice[.]"

The accused challenges the trial panel's conclusion that his actions in the Nutts' bankruptcy proceeding constituted "conduct that is prejudicial to the administration of justice."[4]

---

[4] The accused also argues that "this matter must be dismissed" because of prosecutorial misconduct and prejudicial delay. The Bar admits to a delay in pursuing this matter, but contends that delay is not a reason to dismiss. Rather, the Bar argues the delay should be considered as a mitigating factor in determining the appropriate sanction. As discussed later in the opinion, we agree with the Bar.

Regarding the bankruptcy proceeding, the accused contends that (1) he violated no ethical rule by filing an objection to the settlement; (2) he was acting as the attorney of record in the state court proceeding but did not represent himself to be the attorney of record in the bankruptcy proceeding; (3) he filed his objection to the settlement only to protect the record, in the event that the Nutts decided to pursue an appeal; and (4) the trial panel was required to find that he lied in his December 21, 2000, letter to the Nutts to conclude that he had committed an ethical violation. The accused further argues that the trial panel failed to identify the "law, statute, rule, [or] protocol" that the accused violated by filing the June 26, 2000, objection in the Nutts' bankruptcy proceeding.

■ In reviewing a purported violation of DR 1-102(A)(4), this court first must determine "whether [the] accused lawyer engaged in 'conduct,' by doing something that the lawyer should not have done or by failing to do something that the lawyer was supposed to do." *In re Gustafson*, 327 Or 636, 643, 968 P2d 367 (1998). Next, we determine "whether that conduct occurred during the 'administration of justice.'" *Id.* Finally, we must consider the extent of "the 'prejudice' arising from the lawyer's conduct." *Id.* Prejudice can result from several minor acts or from one serious act. *In re Kluge*, 335 Or 326, 345, 66 P3d 492 (2003).

■■ It is improper for a lawyer to file court documents knowing or having reason to know that the lawyer is not counsel of record for the client on whose behalf the lawyer purports to act. The accused violated that basic tenet by filing an objection in the bankruptcy proceeding—an objection that could have been understood only as having been filed on the Nutts' behalf. The accused was not Nutts' counsel in the bankruptcy proceeding. And, even if the accused did have some authority to file the particular objection that he filed, the Nutts had informed him that the objection was contrary to their wishes. Nevertheless, the accused submitted a *second* filing in support of the first filing, despite knowing that the Nutts had not consented to the objection set out in the first filing. Moreover, the accused waited more than a month

to withdraw his objection after receiving Gluesenkamp's second letter requesting that he do so. Because the accused's filings impeded the orderly operation of the courts and imposed an undue burden on the judicial system, the accused's actions with respect to the bankruptcy proceeding violated DR 1-102(A)(4).

■ Turning to the state court proceeding, the Bar contends that the trial panel erred by concluding that the accused's actions in the Nutts' state court proceeding did not violate DR 1-102(A)(4). Specifically, the Bar points to the following actions: (1) signing the complaint and amended complaint in the Nutts' state court action without evidence to support the damages claim (violation of ORCP 17 C(4)); (2) filing a complaint that included false and frivolous claims for damages (violation of ORCP 21 E); (3) including a claim for punitive damages in the original pleading (violation of *former* ORS 18.535(1) (2001), *renumbered as* ORS 31.725(1) (2003)); (4) failing to consider, to the Nutts' substantial detriment, defendants' offer to discuss a settlement (violation of Multnomah County Local Rule 6.012(1)); (5) failing to stand while addressing the court (violation of UTCR 3.050(1)); (6) instructing the Nutts not to answer questions about their medical condition at deposition when the complaint raised issues regarding their medical condition (violation of ORCP 39 D); and (7) failing to confer prior to moving to compel (violation of UTCR 5.010).

■ The trial panel concluded that those actions were unprofessional individually, but did not violate DR 1-102(A)(4). Specifically, the trial panel reasoned that the alleged statutory and procedural rule violations "leave much room for subjective interpretation" and that "[making those] subjective determinations * * * would effectively require [the trial panel] to review and comprehend the entire record in the underlying case." We disagree with the trial panel. It is true that not every negligent or unprofessional act, no matter how misguided, boorish, or rude, gives rise to an ethical violation. There are, however, circumstances in which a lawyer's cumulative actions are so egregious as to warrant sanction. For the reasons that follow, we conclude that the totality of the accused's conduct during the Nutts' state court litigation rose to that level.

As previously stated, to find a violation of DR 1-102(A)(4), this court first must determine that the accused engaged in improper conduct, that the conduct occurred during the administration of justice, and that it resulted in prejudice. Here, the accused knew that the Nutts' concerns related to delays in the installation and the quality of the contractor's work. Despite that knowledge, he encouraged the Nutts to pursue recovery from their mortgage broker and lender for failing to disclose certain terms of credit for the Nutts' construction loan. Neither the mortgage broker nor the lender had caused the delays or faults in the installation. Moreover, it is unclear from the record how those defendants' alleged failures to make proper disclosures for the Nutts' short-term construction loan caused actual injury to the Nutts. Nevertheless, the accused filed a complaint that claimed, without explanation, that those defendants were liable to the Nutts for hundreds of thousands of dollars in damages.

Over the course of the state proceeding, opposing counsel made numerous attempts to have the accused explain and quantify the Nutts' damages and to consider settlement. However, the accused refused to comply with those requests, even when ultimately ordered to do so by the trial court. Given the apparent weakness of the case that the accused had filed and, particularly, the very limited damages that the Nutts could claim against the defendants, there was simply no justification for the accused's refusal to consider settlement seriously and to so advise the Nutts.

On July 1, 1999, the Nutts appeared at trial, unaware that their case had been decimated by a series of Rule 21 and summary judgment rulings. The accused had not informed the Nutts that they were at serious risk of having judgment imposed against them for statutory attorney fees. At that point, instead of attempting to protect the Nutts from being held liable for attorney fees, the accused chose to focus his efforts on attacking the court for what were, in his opinion, unfavorable rulings. To make matters worse, the accused failed to appear at the attorney fee hearing, at which the court ordered the Nutts to pay more than $61,000. The attorney fee judgment, although entirely foreseeable to any attorney under the circumstances, was completely unexpected by the Nutts and literally forced them into bankruptcy.

At virtually every point in the litigation, the accused made a decision that placed the Nutts in an ever more vulnerable legal and financial position. Each time that the accused ignored or violated a procedural rule, the litigation became more complicated, protracted, and expensive, and ultimately served to prejudice the administration of justice. We conclude that the Bar has proved by clear and convincing evidence that the accused's conduct during the course of the state court proceeding violated DR 1-102(A)(4).

## IV.  SANCTION

We now determine an appropriate sanction for the accused's misconduct. This court follows a well-established methodology in determining the appropriate sanction for violations of the disciplinary rules. *See In re Wittemyer*, 328 Or 448, 459-61, 980 P2d 148 (1999) (determining sanction after reviewing duty violated, mental state, and injury, and noting that sanction may be adjusted based upon aggravating and mitigating circumstances, as well as the court's case law). Consistently with that methodology, we refer to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) and Oregon case law.

### A.  *Duty Violated*

Under ABA Standard 6.2, a lawyer has a duty to "expedite litigation" and "bring a meritorious claim." In this case, the accused brought claims that lacked merit and continued to pursue those claims long after it would have been apparent to any reasonable lawyer that the claims were exceedingly weak and that it was not in his clients' best interest to pursue them. He conducted the state court litigation in an irresponsible and amateurish manner to the prejudice of his clients. Furthermore, in filing the unwanted objections and memorandum in the Nutts' bankruptcy proceeding, the accused violated a duty to the legal system and to the profession to avoid causing interference with a legal proceeding. ABA Standard 6.22.

### B.  *Mental State*

The ABA Standards define the mental state of "knowledge" as the conscious awareness of the nature or attendant circumstances of particular conduct, but without

the conscious objective or purpose to accomplish a particular result. ABA Standards at 7. "Negligence," in turn, is "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." *Id.* The ABA Standards define the mental state of "intent" as "the conscious objective or purpose to accomplish a particular result." *Id.*

The trial panel briefly addressed the issue of mental state and concluded that the accused's actions during the Nutts' bankruptcy proceeding were "knowing." Because the trial panel did not find that the accused's actions in the state court proceeding violated DR 1-102(A)(4), it did not make the corresponding mental state determination respecting that proceeding. Although the Bar agrees that the accused acted "at least knowingly," the Bar also contends that the accused acted "at times intentionally."

As previously stated, the accused knew that the damage claims that he asserted on the Nutts' behalf were at best weak and at worst lacked any factual foundation. That deficiency was repeatedly pointed out to him by the court, but the accused refused to amend the Nutts' complaint to comply with the court's demands. Additionally, the accused knew that he was required by court rules to confer with opposing counsel, but he continually failed or refused to do so. The trial court, in one instance, informed the accused that his motions to compel were not properly before the court until he conferred with opposing counsel. The accused responded by filing certificates with the court that misrepresented his compliance.

Regarding the Nutts' bankruptcy proceeding, the accused was aware that he was not the attorney of record. Furthermore, the accused knew that the Nutts were adamant in their desire not to object to the proposed settlement and that they did not consent to the accused's objection. Despite that knowledge, the accused nevertheless proceeded to file a second unauthorized objection in the Nutts' bankruptcy proceeding.

Based on the foregoing, we conclude that the accused acted knowingly in both the state court and the bankruptcy proceedings. We conclude, however, that there is not clear and convincing evidence that the accused had "the conscious objective or purpose" to ruin the Nutts financially or to unnecessarily make a "mess" of the state court and bankruptcy proceedings, as the Bar argues.

## C. *Injury Sustained*

"[A]n injury need not be actual, but only potential, in order to support the imposition of a sanction." *In re Williams*, 314 Or 530, 547, 840 P2d 1280 (1992). Injury is any actual harm, from "serious" injury to "little or no" injury. ABA Standards at 13. Potential injury is harm that was reasonably foreseeable at the time of the violation but that ultimately did not occur. *Id.* Because the actual damage to the Nutts and the court system was significant, we need not consider potential injury.

Here, the accused's clients, the Nutts, began their litigation with hopes of moving into their retirement home. Before that litigation was concluded, the Nutts were forced to file for bankruptcy. Although he was not the attorney of record, the accused continued to harm the Nutts by involving himself in their bankruptcy proceeding, undermining the Nutts' objectives in the process. Additionally, the named defendants in the state court proceeding incurred tens of thousands of dollars in attorney fees based on claims that ultimately were found to be meritless as a matter of law. A significant part of those attorney fees was attributable to the accused's failure to amend the pleadings as instructed. Finally, the accused's misconduct served to harm the court system itself by subjecting it to numerous and unnecessary hearings.

## D. *Preliminary Sanction Under ABA Standards*

As noted above, the accused knowingly violated his duty to the legal system and to the legal profession. As previously discussed, the ABA Standards suggest that a suspension is the appropriate sanction for such conduct. *See* ABA

Standard 6.22. We now examine the aggravating and mitigating factors present here, as well as Oregon case law, to determine the appropriate sanction.

E. *Aggravating and Mitigating Factors*

■ "[A]ggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed." ABA Standard 9.21. We conclude that the following aggravating factors are present. First, the accused, who was admitted to the Oregon Bar in 1973, has "substantial experience in the practice of law." ABA Standard 9.22(i). Second, the accused's refusal to acknowledge the wrongful nature of his conduct in the bankruptcy proceeding is also an aggravating factor, in that no reasonable lawyer could argue that the unauthorized objections that he filed were appropriate. ABA Standard 9.22(g); *see In re Meyer (I)*, 328 Or 211, 218, 970 P2d 652 (1999) (using and explaining that standard).

■ In addition to those aggravating factors, the Bar argues that the accused's pattern of misconduct should be taken into account in determining the severity of the sanction in this case. Under the circumstances here, we agree. The harm caused in this case did not derive from an isolated incident. Rather, the harm derived from the accused's multiple failures throughout the course of the state court and bankruptcy proceedings. *See In re Jaffee*, 331 Or 398, 411, 15 P3d 533 (2000) (finding a "pattern of misconduct" based on four separate episodes of misconduct).[5]

"[M]itigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." ABA Standard 9.31. The Bar admits that a delay in pursuing the matter is a mitigating factor here. ABA Standard 9.32(j). The length of the delay was significant, in that it took the Bar three and one-half years from

---

[5] In *In re Paulson*, 335 Or 436, 438, 71 P3d 60 (2003), this court held that the accused violated Disciplinary Rule 2-106(A) by billing a client for time spent responding to the client's complaint to the Bar against the accused. In this proceeding, the trial panel did not consider the accused's previous reprimand to be an aggravating factor because that reprimand had been imposed after the events relevant to this second proceeding against the accused. The Bar does not contest that conclusion, and we do not consider that earlier proceeding in aggravation here.

the time of the original complaint to bring this matter to a formal proceeding. Also mitigating the sanction is the absence of evidence that the accused acted with a dishonest or selfish motive. ABA Standard 9.32(b).

## F. *Oregon Case Law*

We turn to this court's case law. Although no case law is precisely on point, several cases nevertheless offer guidance.

In *In re White*, 311 Or 573, 815 P2d 1257 (1991), the accused lawyer engaged in actions similar to those of the accused, including filing repetitive claims and failing to appear at hearings without notice to the trial court or opposing counsel. This court concluded that that conduct violated DR 1-102(A)(4). In that case, however, the court focused on the violation of DR 1-102(A)(4) as well as additional violations when imposing a three-year suspension from the practice of law.

Similarly, in *In re Stauffer*, 327 Or 44, 956 P2d 967 (1998), the accused lawyer pursued a former client through various courts in an attempt to collect an attorney fee. Ultimately, this court found that the lawyer had used the probate and bankruptcy courts as mere tools in his efforts to pursue attorney fees. This court stated that the result was a "staggering amount of unnecessary litigation and the multi-year probate of an essentially no-asset estate, which should have been closed promptly," and concluded that the accused lawyer's conduct had violated DR 1-102(A)(4), along with several other rules. *Id.* at 61. This court imposed a two-year suspension from the practice of law.

The above-described cases concerned various acts of lawyer misconduct that, in turn, constituted multiple violations. The following cases deal with isolated acts that were held to violate only DR 1-102(A)(4). In *Meyer (I)*, 328 Or 211, for example this court suspended a lawyer for 90 days after the lawyer had appeared at a DMV hearing while intoxicated. In *In re Thompson*, 325 Or 467, 940 P2d 512 (1997), this court suspended a lawyer for 63 days after he confronted an appellate judge about a recently issued decision.

■ Here, the accused's conduct in both the Nutts' state court and bankruptcy court proceedings constituted violations of DR 1-102(A)(4). Although the accused's actions were more severe than the misconduct in *Meyer* and *Thompson*, they do not, in our view, rise to the level at issue in the *White* and *Stauffer* matters. We conclude that the accused's conduct, together with the applicable aggravating and mitigating factors, warrants a suspension of six months.

The accused is suspended from the practice of law for six months, commencing 60 days from the effective date of this decision.