Argued and submitted December 10, 2008, accused suspended from practice of law for a period of 60 days, commencing 60 days from date of filing of decision February 5, 2009

# In re Complaint as to the Conduct of

## G. JEFFERSON CAMPBELL, JR.,
*Accused.*

(OSB 06-14, 06-127; SC S055577)

202 P3d 871

G. Jefferson Campbell, Jr., in *propria persona*, argued the cause. Douglas J. Richmond, Kellington, Krack, Richmond, Blackhurst & Glatte, LLP, Medford, filed the briefs for the accused.

Stacy J. Hankin, Assistant Disciplinary Counsel, Tigard, filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary matter, the Bar charged the accused with ethical violations in two separate matters. In the first matter, the Bar charged that the accused violated conflict of interest rules in a bankruptcy case. The trial panel concluded (1) that the accused did not violate DR 5-101(A)(1)[1] when, although he had represented the debtor in a Chapter 13 bankruptcy proceeding, and was therefore an administrative creditor of the estate, he agreed to serve as special counsel to the estate when the bankruptcy was converted to a Chapter 7 proceeding; but (2) that the accused did violate DR 5-105(C) when, after the trustee in the Chapter 7 case reached a settlement that was contrary to the accused's interest in collecting his fees, he resigned as special counsel and represented new clients in an appeal that challenged the settlement. In the second matter, the trial panel concluded that the accused violated DR 2-106(A) when he charged his client, Burch, for late fees in excess of the legal rate of interest, although no written agreement required payment of such fees, and when he charged Burch hourly fees for a trespass case, although a written agreement provided for a contingency fee. In part because the accused had been disciplined previously, the trial panel recommended that he be suspended from the practice of law for 90 days.

■    Pursuant to ORS 9.536(1) and Bar Rules of Procedure (BR) 10.1 and 10.3, both the Bar and the accused seek review of the trial panel's conclusions.[2] This court reviews the trial panel decision *de novo*. ORS 9.536(2); BR 10.6. The Bar must establish misconduct by clear and convincing evidence, *i.e.*, "evidence establishing that the truth of the facts asserted is highly probable." *In re Cohen*, 316 Or 657, 659, 853 P2d 286 (1993). As to the bankruptcy matter, we conclude, as did the trial panel, that the accused did not

---

[1] The Oregon Rules of Professional Conduct (RPC) became effective January 1, 2005. Because the conduct at issue here occurred before that date, the Disciplinary Rules (DRs) of the Oregon Code of Professional Responsibility apply. *In re Fitzhenry*, 343 Or 86, 88 n 1, 162 P3d 260 (2007). All citations are to the 2004 version of the Disciplinary Rules unless otherwise noted.

[2] The trial panel also concluded that the accused did not violate DR 7-101(A)(3) (prohibiting lawyer from intentionally damaging or prejudicing client), and the Bar does not seek review of that decision.

violate DR 5-101(A)(1), but did violate DR 5-105(C). As to the Burch matter, we conclude that the accused violated DR 2-106(A) in charging Burch late fees not provided for by prior written agreement, but that the Bar failed to prove that the accused had charged Burch excessive fees in violation of DR 2-106(A), when he billed Burch for his services on an hourly fee basis. We impose a suspension of 60 days.

## I.   FACTS AND PROCEDURAL HISTORY

### A.   *Facts in the Bankruptcy Matter*[3]

The accused represented Kara, the debtor, in a Chapter 13 bankruptcy proceeding. The most important asset of the bankruptcy estate was a piece of real property known as the Phoenix Club. Three secured creditors had liens on the property. The Dorsey Trust (Dorsey)[4] held the lien that was in first position, the Ziegenhagen family (Ziegenhagens) was in second position, and First Call Mortgage (First Call) held the third secured interest in the property.

The bankruptcy court ordered that the bankruptcy be converted from a Chapter 13 to a Chapter 7 proceeding and appointed Tracy Trunnell, an attorney, to serve as trustee for the bankruptcy estate. At that time, the debtor owed the accused attorney fees of approximately $20,000 for work in the Chapter 7 case, and the accused was an administrative expense creditor of the estate. *See* 11 USC § 503 (describing administrative expense claims).

Shortly after the conversion, Dorsey, the senior lien creditor, began to take steps to obtain judicial authority to foreclose its lien. The accused discussed with Trunnell the possibility that she retain him to challenge the validity of Dorsey's lien, and Trunnell agreed to employ him to bring an adversary proceeding against Dorsey.[5] In his application for

---

[3] The facts in both the bankruptcy and the Burch matters are undisputed except as otherwise noted.

[4] Dorsey was the party that filed a complaint with the Bar. Dorsey was not a client of the accused.

[5] An adversary proceeding in bankruptcy is a specified form of civil action within the context of the bankruptcy proceeding. *See* FRBP 7001 (defining adversary proceedings). For example, a proceeding to determine the validity, priority, or extent of a lien or other interest in property is an adversary proceeding. FRBP 7001(2).

appointment as special counsel, the accused disclosed his earlier representation of the debtor in the Chapter 13 case and stated that the interests of the debtor and the trustee in employing him to file an adversary proceeding against Dorsey were the same. The accused reasoned that, if the challenge to Dorsey's lien were successful, the benefits of that challenge would redound to the junior secured creditors, the Ziegenhagens and First Call, and possibly also to unsecured creditors. Furthermore, defeat of Dorsey's security interest would make payment of the administrative expenses of the estate, including the fees of the accused in the Chapter 13 case, more likely.

The accused sought a preliminary injunction to prevent Dorsey from foreclosing. Before the injunction hearing, the parties engaged in settlement discussions. Trunnell, who had begun to have concerns about both the merits and potential expense of the adversary proceeding, changed her position and negotiated a settlement that permitted Dorsey to proceed with foreclosure on the condition that it pay the trustee $18,000 out of the sale proceeds. The accused thought, however, that those terms wrongly granted Dorsey a windfall, precluded payment of the claims of the other creditors, and possibly also precluded payment of his fees. The accused decided that he could not advocate for the settlement and informed Trunnell that he needed to resign as special counsel in the adversary proceeding.

After the court permitted the accused to withdraw as special counsel,[6] the accused filed an objection to the settlement on behalf of his law firm and encouraged the Ziegenhagens and First Call to do the same. Despite those objections, the bankruptcy court entered an order permitting the settlement. The accused then, on his own behalf but also as the attorney for the Ziegenhagens and First Call, filed an appeal to the Bankruptcy Appellate Panel of the Ninth

---

[6] Although 11 USC section 327(e) requires court approval for the trustee to employ special counsel, the court never gave that approval. Trunnell never submitted one application, dated September 20, 2004. According to Trunnell, she had submitted a second application, dated September 22, 2004, but it did not appear in the court's records. In May 2005, after the accused withdrew, Trunnell filed a notice of employment application with the court, attaching the prior applications. The Bar does not argue that the accused was not authorized to act as special counsel.

Circuit and then to the Ninth Circuit itself. *In re Kara*, 258 Fed Appx 154 (9th Cir 2007). The appeals were unsuccessful, and the appellate courts upheld the settlement that Trunnell had negotiated. Trunnell incurred $18,000 in attorney fees to contest those appeals.

## B. *Facts in the Burch Matter*

The accused represented Burch in 10 or more matters over a number of years and billed Burch for those services. On the lower margin of many of the bills that were received in evidence, the accused included the following statement: "Statements not paid within 30 days of billing will be charged a late fee of 1½% per month of the unpaid balance on the statement." The late fees exceeded the legal rate of interest, and the fee agreements that were received in evidence and signed by Burch did not include a provision requiring that Burch pay those fees. *See* ORS 82.010(1) (2003) (legal rate of interest for certain transactions, unless parties otherwise agreed, was nine percent per year).

On October 18, 2000, the accused and Burch entered into a contingent fee agreement providing that the accused would represent Burch in a case that involved assault, battery, and trespass claims against one Thompson. On February 27, 2001, the accused wrote a letter to Burch advising him to file two separate actions in the Thompson case— one for the assault and battery claims, and one for trespass. In the accused's view, the potential award on the assault and battery claims, which had resulted in personal injuries, was sufficient to justify a contingent fee. By contrast, the potential award on the trespass claim likely would not be sufficiently sizeable to justify the accused handling the case on a contingent fee basis. However, the accused reasoned, the trespass claim would entitle Burch to seek an award of attorney fees reasonably incurred, should he prevail. *See* ORS 20.080 (providing for attorney fees in certain tort actions pleading minimal damages). That suggested to the accused that it would be better to bill the trespass claim on an hourly fee basis. During several telephone conversations and one in-person meeting, the accused and Burch discussed the fee arrangement. The accused testified that Burch had agreed to

the change that the accused had proposed and that, thereafter, the accused had billed Burch on an hourly fee basis for the work that he performed on the trespass matter in accordance with their modified oral agreement. Burch testified that he did not remember agreeing to the change in billing. However, the accused established that he had billed Burch on an hourly fee basis for his work on the trespass claim and that Burch had paid most, but not all, of those bills.

Burch did not prevail in the trespass case against Thompson and was therefore not entitled to seek recovery in that action. The accused notified Burch that he owed fees for the Thompson trespass case and other unrelated matters and billed Burch a total of more than $15,000. That total included approximately $300 in late fees and slightly more than $1,000 for the Thompson trespass matter. When Burch refused to pay any portion of that bill, the accused transferred the debt to a collection agency. At the arbitration that followed, Burch was required to pay approximately half of the amount that the accused had billed him. It is unclear whether the arbitration award included the late fees or any sum for the trespass matter.

## C. *Procedural History*

The Bar filed its initial formal complaint against the accused on April 11, 2006, and an amended complaint on December 8, 2006. The accused denied the majority of the Bar's allegations, but conceded as to the Burch matter that he had violated DR 2-106(A) (charging an illegal or excessive fee) when he billed Burch for late fees at 18 percent per year without having included a provision for an enhanced rate of interest in the fee agreements that Burch signed. As noted, the trial panel determined that the Bar had proved by clear and convincing evidence the charged violations of DR 5-105(C) (representing new client when interests conflict with those of former client) in the bankruptcy matter and DR 2-106(A) (charging an illegal or excessive fee) in the Burch matter. The trial panel also determined that the Bar had not satisfied its burden of showing that the accused had violated DR 5-101(A)(1) (representing client when client's interests may be affected by lawyer's own interests) or DR 7-101(A)(3)

(intentionally damaging client), both in the bankruptcy matter. The trial panel determined that a 90-day suspension was appropriate, in part because the accused had been sanctioned previously for other disciplinary violations.

In this court, the Bar seeks review of the trial panel finding that the accused did not violate DR 5-101(A)(1) in the bankruptcy matter, and the accused seeks review of the trial panel finding that he did violate DR 5-105(C) in that matter. In the Burch matter, the accused concedes that his imposition of late fees violated DR 2-106(A), but he seeks review of the trial panel finding that he violated that rule in charging an hourly fee for the trespass claim.

## II. DISCUSSION

### A. *Violation of DR 5-101(A)(1) in the Bankruptcy Matter*

■ The Bar seeks review of the trial panel's decision that the accused did not violate DR 5-101(A)(1) in the bankruptcy matter. Pursuant to that rule, a lawyer is prohibited from accepting or continuing employment "if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests," unless the client consents after full disclosure. DR 5-101(A)(1). The Bar argues that the accused violated that rule because he accepted employment as special counsel in the Chapter 7 bankruptcy when his personal interest either affected or may have affected his judgment. The Bar contends that the accused's interests were affected because his primary motivation in seeking to challenge the Dorsey lien was to protect his outstanding Chapter 13 fees.

■■ To analyze the accused's duties in the Chapter 7 proceeding, it is important to describe the duties of a trustee and the various roles that attorneys employed by trustees may have. When a debtor files a petition in bankruptcy, an estate is created. *See* 11 USC § 541(a) (describing creation of bankruptcy estate). In a Chapter 7 liquidation proceeding, a trustee manages the estate for the benefit of the creditors of the estate. The trustee's duties include marshaling assets and liquidating the property of the estate as expeditiously as is compatible with the best interests of the parties in interest.

11 USC § 704(1). The trustee's primary duty is to manage the assets for the benefit of the unsecured creditors. *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,* 375 BR 719, 727 (Bankr SDNY 2007); *In re Thu Viet Dihn,* 80 BR 819, 822 (Bankr SD Miss 1987). Secured creditors, by contrast, do not need the trustee's protection nearly as much as the unsecured creditors, because the secured creditors have (or ought to have) adequate protection based on their security interests. *Dihn,* 80 BR at 822.

The bankruptcy trustee may hire an attorney for general advice and assistance or to perform a particular task, and different conflict of interest rules apply in each instance. The trustee may hire an attorney "to represent or assist the trustee in carrying out the trustee's duties." 11 USC § 327(a). Such an attorney must "not hold or represent an interest adverse to the estate" and must be a "disinterested person." *Id.*; 11 USC § 101(14) (defining "disinterested person" as, *inter alia,* not a creditor). By contrast, with court approval and "for a specified special purpose, other than to represent the trustee in conducting the case," the trustee may employ a special counsel. Although an attorney who previously has represented the debtor is likely to have unsatisfied legal fees, *see In re Heatron, Inc.,* 5 BR 703, 705 (Bankr WD Mo 1980) (so stating), special counsel may be "an attorney that has represented the debtor, if [it is] in the best interest of the estate." 11 USC § 327(e). Rather than having to satisfy the stricter criteria applicable to a "disinterested person," special counsel may hold an interest adverse to the estate, but must "not represent or hold any interest adverse to the debtor or to the estate *with respect to the matter on which such attorney is to be employed.*" *Id.* (emphasis added). As the trustee, Trunnell, indicated in her testimony, efficiency is a prime consideration in employing the debtor's attorney as special counsel, because the debtor's attorney is familiar with the case, the parties, and the claims.

In this case, Trunnell employed the accused as special counsel, and the Bar understandably does not contend that the accused's interest in collecting his fees alone created a conflict of interest sufficient to subject him to the requirements of DR 5-101(A)(1). At the time that the accused sought and accepted that employment, he did not represent or hold

an interest adverse to the debtor or to the estate with respect to the adversary proceeding for which he was employed. Trunnell's duty in the adversary proceeding was to manage the estate for the benefit of the unsecured creditors, and the accused's interest and the interest of the trustee were the same: to increase the size of the estate for the benefit of the creditors, including the accused.

The Bar argues that, in this case, however, the accused's interests were different from those of other lawyers who have represented debtors and who thereafter represent the bankruptcy estate. Here, the Bar contends, the accused's self-interest was primary and overrode his interest in protecting the estate and the other creditors. For that contention, the Bar relies on a letter that the accused wrote to the United States Trustee after the conflict with Trunnell over the settlement arose. In that letter, the accused wrote that "protection of this Chapter 13 administrative expense claim was one of the prime motivating reasons" for his undertaking to represent the estate. Trunnell testified in the disciplinary proceeding that, when she first employed the accused, she did not know that he was primarily motivated to protect his fees and that, in the absence of that knowledge, she had relied on the accused's advice and may not have considered the extra costs or chances of prevailing in the adversary proceeding. The Bar asserts that the judgment of a lawyer who is primarily motivated to protect his fees is, or certainly may be, affected by that interest.

The accused responds that the Bar misconstrues his memo to the United States Trustee. Although he stated in that memo that *one* of the primary motivations for his representation of the estate was to protect his fees, he did not state that collecting those fees was his *only* motivation. The accused also argues that the Bar misconstrues Trunnell's testimony. Specifically, the accused points to Trunnell's testimony that, before the injunction hearing, Trunnell had "always seen it as [the accused] putting forth legal efforts to do what was best for the estate, and that's what we both were trying [to] do."

We do not find the Bar's evidence that the accused's only motivation in serving as special counsel was to protect

his own interests to be clear and convincing. The interests of the accused and Trunnell were aligned until Trunnell decided to enter into a settlement that had the potential to foreclose payment of the accused's fees. In a bankruptcy case, it is not unusual for interests to shift. The multiplicity of parties and interests in bankruptcy proceedings make for a context that "is rich in the potential for conflict, but it is also rich in the potential for cooperation." John D. Ayer, *How to Think About Bankruptcy Ethics*, 60 Am Bankr L J 355, 386 (1986). In bankruptcy, the multiple creditors, each with either a secured or an unsecured interest, each of whom occupies a particular place in the pecking order of priorities, have inherently varying interests, and the trustee may not be able to satisfy all of those interests out of the limited resources of a liquidated estate. *See* 11 USC § 507 (listing priority of expenses and claims). When the accused undertook to represent the estate in the adversary proceeding against Dorsey, he and Trunnell thought that that proceeding would defeat the interests of one creditor, Dorsey, but would benefit the others. Alliances shifted when Trunnell determined that Dorsey, rather than the other creditors, should recover its claim. Although that shift created a conflict for the accused, it does not establish that that conflict existed when he initially undertook to file the adversary proceeding. We agree with the trial panel that the accused did not violate DR 5-101(A)(1).

## B.  *Violation of DR 5-105(C) in the Bankruptcy Matter*

The accused seeks review of the trial panel's decision that he violated DR 5-105(C) in the bankruptcy matter. Pursuant to DR 5-105(C), after representing a former client, an attorney cannot represent another client in the same or a significantly related matter when the current client's interests conflict with the former client's interests, unless all the clients consent after full disclosure under DR 5-105(D). DR 5-105(C) specifically provides, in part: "Except as permitted by DR 5-105(D), a lawyer who has represented a client in a matter shall not subsequently represent another client in the same or a significantly related matter when the interests of the current and former clients are in actual or likely conflict."

In this case, the Bar charged that DR 5-105(C) precluded the accused from representing the Ziegenhagens and First Call on appeal of the Bankruptcy Court's approval of the Dorsey settlement. The Bar contends that the interests of those clients in opposing the settlement conflicted with the interests of the accused's former client, Trunnell, whose interest was in affirming the settlement. The accused responds that Trunnell was not his client, that the appeal was not the same matter as, or significantly related to, the adversary proceeding, and that the interests of his new and former clients did not conflict. We turn to those arguments.

### 1. *Who was the former client?*

The accused argues that, in the adversary proceeding, he was special counsel for the bankruptcy *estate*, not Trunnell. He further argues that, even though Trunnell had decided, as trustee of the estate, to settle with Dorsey, the interests of the estate were independent of those of the trustee.

The Bar argues that the accused's distinction is too fine, and we agree. When a lawyer represents a corporation, the lawyer represents, for the purpose of conflict of interest analysis, the entity, not the person who manages the entity. *See In re Banks*, 283 Or 459, 469, 584 P2d 284 (1978) ("[t]he corporation usually is considered an entity[,] and the attorney's duty of loyalty is to the corporation and not to its officers, directors or any particular group of stockholders"). However, the entity may act only through its authorized representatives, and, in representing the entity, the lawyer generally must follow their directives. *See* RPC 1.13(a) ("lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents").

A personal representative of a decedent's estate similarly has authority to direct a lawyer who the personal representative hires for advice and counsel in the administration of a decedent's estate. *See* ORS 114.305(18) ("a personal representative, acting reasonably for the benefit of interested persons, is authorized to [e]mploy qualified persons, including attorneys, accountants and investment advisers, to

advise and assist the personal representative and to perform acts of administration, whether or not discretionary, on behalf of the personal representative"). This court has concluded that, for purposes of conflict of interest analysis, when the personal representative hires a lawyer, the lawyer must treat the personal representative as the laywer's client. *See* ORS 113.135 ("[i]f the personal representative has *employed an attorney to represent the personal representative in the administration of the estate*, the personal representative shall file in the estate proceeding the name and post-office address of the attorney unless that information appears in the petition or the order appointing the personal representative" (emphasis added)); *In re Phelps*, 306 Or 508, 517, 760 P2d 1331 (1988) ("[t]he accused was the lawyer for the personal representative"); *In re Howard*, 304 Or 193, 204, 743 P2d 719 (1987) ("the accused's client was the personal representative").

In this case, the accused understood that it was Trunnell who defined the interests of the estate. In his Application to Employ Attorney, the accused stated, in relevant part, that "[t]he trustee seeks to employ Special Counsel, G. Jefferson Campbell, Jr. of the law firm of G. Jefferson Campbell, Jr., P.C., to assist *the trustee* in the following discrete matters having the following potential benefits to the estate." (Emphasis added.) The accused also verified in that document that he "[would] be the *trustee's* attorney of record." (Emphasis added.) In addition, when the accused objected to the settlement that Trunnell had arranged, the accused referred to himself as "former *special counsel to the Chapter 7 Trustee*." (Emphasis added.)

We conclude that, whether the accused represented Trunnell or the estate, Trunnell's decisions represented the interests of the estate and the accused therefore could not represent new clients who opposed the estate's interests, as she determined them to be, without her consent. It is undisputed that the accused did not obtain that consent.

2. *Was the adversary proceeding the same matter as the appeal of the settlement?*

■ The accused next argues that the appeal in which he represented the Ziegenhagens and First Call was a different

matter from the adversary proceeding against Dorsey. The accused argues that the appeal was a "contested matter." A "contested matter" is a matter that addresses factual and legal issues arising out of particular statutes, procedures, and practices in bankruptcy. By definition, a "contested matter" does not include an adversary proceeding. *See* Advisory Committee Note to FRBP 9014 ("Whenever there is an actual dispute, other than an adversary proceeding, before the bankruptcy court, the litigation to resolve that dispute is a contested matter."). According to the accused, the appeal and the adversary proceeding were, therefore, different matters.

The accused's argument is not well-taken. The appeal was from the outcome of the adversary proceeding. Whether or not the appeal falls within the definition of a "contested matter," the dispute in that appeal centered on the settlement reached in the adversary proceeding, and the adversary proceeding and the appeal were both parts of a single bankruptcy proceeding. Thus, both the adversary proceeding and the appeal were the same matter for purposes of DR 5-105(C).

3. *Did the representation of the Ziegenhagens and First Call conflict, or was it likely to conflict, with the accused's former role as special counsel?*

■ The accused argues finally that the interests of the bankruptcy estate and those of his new clients, the Ziegenhagens and First Call, did not conflict and were not likely to conflict. A disagreement between two representatives of a bankruptcy estate, the accused contends, does not constitute a violation of DR 5-105(C).

We disagree. Trunnell's interest, and therefore the interest of the bankruptcy estate, in enforcing the settlement directly conflicted with the Ziegenhagens' and First Call's interests in setting that settlement aside. Therefore, the accused could not represent the latter without obtaining the consent of the former, after full disclosure. DR 5-105(D). The accused did not obtain that consent. We conclude that he violated DR 5-105(C).

## C.  *Violation of DR 2-106(A) in the Burch Matter*

■        The accused seeks review of the trial panel's decision that he violated DR 2-106(A) by charging his client, Burch, a clearly excessive fee in the trespass action against Thompson. DR 2-106(A) provides that "[a] lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee."

The parties agree that, if the accused had an agreement with Burch to charge him fees in the trespass case on an hourly basis, then the fees that he charged were not excessive, but that, if the accused's agreement with Burch was that he would charge his fees in that matter on a contingency basis, then the fees were clearly excessive. *See In re Sassor*, 299 Or 720, 725, 705 P2d 736 (1985) (lawyer violates DR 2-105(A) by charging more than the agreed-upon fee).

The Bar argues that the written contingency fee agreement is clear and convincing evidence that the parties agreed to those terms. Relying on *In re Balocca*, 342 Or 279, 151 P3d 154 (2007), the Bar argues that the accused bears the burden of proving that that contract was modified. The Bar contends that the accused failed to meet that burden and points to the fact that Burch could not recall entering into a new agreement, that the accused could not produce any written documentation of the new agreement, and that no subsequent correspondence between Burch and the accused referred to the new agreement.

The accused takes the position that the Bar bears the burden to prove the terms of his fee agreement with Burch and that the fees that the accused charged varied from those terms. The accused asserts that the evidence establishes that he had ample reason to separate the trespass action from the assault and battery action, that he explained the modification of the fee agreement to Burch both over the phone and in his office, and that Burch agreed to it, although Burch's memory is now unclear. The accused also relies on the fact that the billing statements reflect a change in the fee agreement, that Burch paid many of the hourly bills for the trespass matter, and that Burch objected to the hourly billing only after a collection action was filed.

■    We conclude that the Bar bears the burden of proof
and that it has failed to produce clear and convincing evi-
dence to meet it. To establish that the accused charged Burch
excessive fees, the Bar must show that it is highly likely that
Burch did not agree to pay hourly fees and that the accused
nevertheless charged his time on that basis. Although the
Bar argues that *Balocca* holds that the burden shifts to the
accused to prove the existence of a fee agreement, that case is
inapposite. That case involved a laywer's assertion that
money that he had received from a client did not have to be
deposited into a trust account. This court noted there "that
client funds must be deposited into a lawyer trust account
unless a *written agreement* provides that the funds are non-
refundable and are deemed earned upon receipt." 342 Or at
288 (emphasis in original omitted; emphasis added).[7] The
case before us presents a different problem: evidence of the
terms of an hourly fee agreement when there is *no require-
ment* that an hourly fee agreement be in writing. Where the
law does not require that the agreement between the lawyer
and client be in writing, it is the Bar, and not the accused,
that bears the burden to prove that the lawyer charged the
client fees that were not authorized by the terms of the agree-
ment. Although the Bar's proof that the parties originally
entered into a written contingency fee agreement is signifi-
cant, the accused also provided evidence that he and
Burch had agreed orally to substitute an hourly fee agree-
ment and that Burch had made payments in accordance with
that modified agreement. We conclude that the Bar failed to
prove by clear and convincing evidence that the accused
charged Burch excessive fees for the Thompson trespass
action.

■    The Bar also alleged that the accused charged an
excessive fee when he billed Burch for late fees in excess of
the legal rate of interest without obtaining Burch's written
agreement to pay those charges.[8] Because the accused

---

[7] *In re Knappenberger*, 344 Or 559, 561-65, 186 P3d 272 (2008) (*Knappenberger II*), also does not support the Bar's position. There, the lawyer charged a fee in con-
nection with a social security disability claim for which he had no authorization,
which was required by federal law. Although the evidence demonstrated that the
lawyer nevertheless billed the client for the work, this court did not find credible
his explanation that he did not expect payment for the bills for that work.

[8] *See* ORS 82.010(1) (2003) (legal rate of interest for certain transactions was
9% per year, unless parties otherwise agreed).

concedes that violation, we conclude that the accused violated DR 2-106(A) in that regard.

## D. *Sanction*

In determining an appropriate sanction, we apply the ABA Standards for Imposing Lawyer Sanctions (ABA Standards). *See In re Biggs*, 318 Or 281, 295, 864 P2d 1310 (1994); *In re Spies*, 316 Or 530, 541, 852 P2d 831 (1993) (so stating). We preliminarily determine the appropriate sanction based on (1) the duty violated; (2) the accused's mental state; and (3) the actual or potential injury that the misconduct caused. ABA Standard 3.0. We then examine any aggravating or mitigating circumstances to determine whether we should adjust the preliminary sanction. *Id.* Finally, we review our prior case law for guidance in imposing the appropriate sanction. *In re Huffman*, 331 Or 209, 223, 13 P3d 994 (2000).

### 1. *Preliminary analysis*

The accused violated duties that he owes to the legal profession by failing to avoid conflicts of interest in the bankruptcy matter, ABA Standard 4.3, and by charging an excessive fee in the Burch matter, ABA Standard 7.0.

We find the accused's mental state to be knowing as to the conflict and intentional as to the clearly excessive fee. " 'Intent' is the conscious objective or purpose to accomplish a particular result." ABA Standards at 7. " 'Knowledge' is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Id.* When the accused appealed the settlement in the bankruptcy matter, his "conscious purpose or objective" was to overturn the bankruptcy settlement. He knew all of the facts that indicated that a conflict existed. It is irrelevant that he did not know that his conduct violated the disciplinary rules or intend to engage in a violation of those rules. *In re Schenck*, 345 Or 350, 369, 194 P3d 804 (2008), *modified on recons*, 345 Or 652, 202 P3d 165 (2009). The accused's mental state was therefore either knowing or intentional. Resolution of that issue depends on whether the accused intended to accomplish a particular result.

When a lawyer knowingly takes action, the lawyer obviously intends to accomplish some result; the action taken is a result. So, for instance, in this case, the accused intended to represent the Ziegenhagens and First Call on appeal and to take a position opposite to that of the trustee. However, the accused did not intend to harm the entity that he viewed as his prior client, the bankruptcy estate. He intended to accomplish the result of benefitting the estate. In prior cases in which the court has found that a lawyer acted intentionally it has required a showing that the result that the accused intended was not the act taken, but the harmful (to others) or beneficial (to the accused) effect of that act. *See In re Paulson*, 341 Or 13, 31, 136 P3d 1087 (2006) (in filing improper objection in bankruptcy matter, lawyer acted knowingly rather than intentionally because evidence did not show that he sought to "make a 'mess' " of the proceedings); *In re Knappenberger*, 338 Or 341, 357, 108 P3d 1161 (2005) (*Knappenberger I*) (although representation resulting in conflict was knowing because accused persisted after he knew facts giving rise to conflict, violation was not intentional because lawyer did not use that conflict to his advantage). In this case, the accused did not intend to harm the estate or to use the conflict to his advantage and, we therefore find his conduct in the bankruptcy matter to be knowing rather than intentional. However, in billing Burch for past-due payments at a rate in excess of the legal rate of interest, the accused's goal was not only to encourage timely payment of his bills, but, if timely payment did not occur, to collect a clearly excessive fee. *See In re Knappenberger*, 344 Or 559, 573, 186 P3d 272 (2008) (*Knappenberger II*) (lawyer acted intentionally by charging client clearly excessive fee). In that regard, the accused's violation of his ethical duties was intentional.

We next consider whether the accused's violations resulted in actual or potential injury. " 'Potential injury' is harm to the client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct and that, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct." ABA Standards at 7. The accused's clients and the legal system clearly suffered a kind of noneconomic harm by

the accused's misconduct. He represented new clients whose interests were opposed to those of a former client, and he charged another client excessive fees.

Whether the affected clients also suffered actual economic harm as a result is more difficult to discern. In the Burch matter, the accused charged Burch more than $300 in late fees, but the Bar did not convincingly prove that Burch had paid them. The collection agency sought to collect more than $15,000 from Burch, but was awarded less than $8,000. The arbitration award may not have included the excessive late fees, and Burch may not have paid them. In the bankruptcy matter, the Bar argues that Trunnell had to pay for a laywer to defend the settlement from which the accused appealed. However, the accused also objected to and appealed the settlement on his own behalf, and Trunnell would have been required to employ a lawyer even if the accused had not also represented the junior lienholders. There was little economic injury, if any, when the accused also opposed the settlement on behalf of the Ziegenhagens and First Call, because he was already representing his own interests in the appeal.

Given that the accused violated his duties to the legal profession, acted knowingly, and caused harm, including potential economic harm, to his clients, the accused's conduct was such that a suspension may be warranted depending on the aggravating and mitigating considerations.

### 2. *Aggravating and mitigating circumstances*

The most significant aggravating circumstances present in this case are the accused's prior disciplinary violations and the pattern of misconduct that they represent. ABA Standard 9.22(a), (c). The accused was publicly reprimanded on three prior occasions. In 1996, the reprimand was issued for violations of the ethical rules relating to trust accounting; in 2002, the accused was found guilty of failing to have a written agreement for a nonrefundable retainer; and in 2003, the accused was disciplined for charging a clearly excessive fee, namely, a penalty of one-and-a-half times the normal hourly rate if the client did not follow the accused's recommendations. These violations demonstrate a pattern of violating the ethical rules regarding the charging and payment of attorney fees.

Another aggravating factor is that the accused exhibited a selfish motive in charging late penalties and in representing the Ziegenhagens and First Call as clients. ABA Standard 9.22(b). The accused's motive was to generate fees, and, although that motive is not dishonest, we conclude that the accused acted out of self-interest. The accused also committed multiple offenses, ABA Standard 9.22(d), and had substantial experience in practicing law, ABA Standard 9.22(i), two additional aggravating factors.

In mitigation, the accused provided full and free disclosure to the Bar and trial panel and maintained a cooperative attitude. ABA Standard 9.32(e). On balance, the aggravating circumstances outweigh the mitigating ones, and we deem a suspension to be in order.

3. *Prior Oregon case law*

As this court has explained on several occasions, a finding that a lawyer has engaged in a conflict of interest in violation of DR 5-105, standing alone, typically justifies a 30-day suspension. *Knappenberger I*, 338 Or at 361; *In re Hockett*, 303 Or 150, 164, 734 P2d 877 (1987). However, where discipline is imposed for a sole conflict of interest violation, there have been circumstances in which this court has imposed the lesser sanction of a reprimand, *see, e.g., In re Kinsey*, 294 Or 544, 660 P2d 660 (1983) (attorney who engaged in conflict of interest given reprimand), or suspensions lengthier than 30 days. *See In re Wittemyer*, 328 Or 448, 980 P2d 148 (1999) (attorney who engaged in conflict of interest causing actual injury, even in absence of prior disciplinary history, suspended for four months). Here, the accused not only engaged in a conflict of interest, he also charged his client an excessive fee. The dual violations and the aggravating factors that we have described militate for more than a 30-day suspension. The accused's cooperative attitude and our difficulty in discerning that the accused caused actual economic injury militate against a 90-day suspension. We conclude that a 60-day suspension is appropriate.

The accused is suspended from the practice of law for a period of 60 days, commencing 60 days from the date of filing of this decision.