Argued and submitted March 1, accused suspended from practice of law for 150 days, commencing 60 days from date of filing of decision July 29, 2010

## In re Complaint as to the Conduct of

## D. RAHN HOSTETTER,
*Accused.*

## (OSB Nos. 07-37, 007-161; SC S056471)

238 P3d 13

Roy Pulvers, Hinshaw & Culertson LLP, Portland, argued the cause and filed the briefs for the accused.

Stacy Hankin, Assistant Disciplinary Counsel, Oregon State Bar, Tigard, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

**PER CURIAM**

In this lawyer disciplinary matter, the Bar charged the accused with ethical violations in two separate matters. In the Ingle matter, the Bar alleged that the accused violated the former-client conflict-of-interest rule. The trial panel concluded that the accused violated DR 5-105(C) and RPC 1.9(a) when, having represented the borrower in the underlying loan transaction, he subsequently represented the lender in collecting the loans from the borrower's estate. In the Grohs matter, the Bar alleged that the accused violated the rule against misrepresentation. The trial panel concluded that the accused violated RPC 8.4(a)(3) when he "acquiesced [in] the removal" of a notarized signature page from one deed and had it placed on a second deed, which contained a different legal description, and then had the altered deed recorded. In part because the accused had been disciplined previously, the trial panel recommended that he be suspended from the practice of law for 150 days.

■   Pursuant to ORS 9.536(1) and Bar Rules of Procedure (BR) 10.1 and 10.3, the accused seeks review of the trial panel's conclusions. This court reviews the trial panel decision *de novo*. ORS 9.536(2); BR 10.6. The Bar must establish misconduct by clear and convincing evidence. BR 5.2. Clear and convincing evidence means "evidence establishing that the truth of the facts asserted is highly probable." *In re Cohen*, 316 Or 657, 659, 853 P2d 286 (1993). As to the Ingle matter, we conclude that the accused violated DR 5-105(C) and RPC 1.9(a). As to the Grohs matter, we conclude that the accused violated DR 1-102(A)(3) and RPC 8.4(a)(3).[1] We impose a suspension of 150 days.

## I.  FACTS AND PROCEDURAL HISTORY

A.  *The Ingle Matter*

In the mid 1990s, the accused represented Pearl Ingle in obtaining a series of loans from Andrew Hohn and

---

[1] The Oregon Rules of Professional Conduct (RPC) became effective January 1, 2005. The Disciplinary Rules (DRs) of the Oregon Code of Professional Responsibility apply to conduct before that date. *In re Fitzhenry*, 343 Or 86, 88 n 1, 162 P3d 260 (2007). Because the accused's conduct in these matters occurred both before and after January 1, 2005, both the DRs and the RPC apply.

drafted the documents to evidence and secure those loans. The documents included several promissory notes and a mortgage in favor of Hohn on certain property owned by Ingle (loan transactions). The accused also represented Ingle in obtaining from Hohn partial releases of the mortgage securing the loans. In 2004, Ingle died, and her daughter was appointed personal representative of Ingle's estate. Ingle's will directed that all her "just debts and liabilities" be "fully paid."

During 2004 and 2005, the accused represented Hohn in collecting the outstanding loans that Hohn had made to Ingle during her lifetime (the debt collection).[2] In particular, the accused asserted a probate claim on Hohn's behalf against Ingle's estate based on the promissory notes and mortgages that he had previously prepared for Ingle. The personal representative disallowed the claim. The accused then demanded that the personal representative pay Hohn $81,519.29 or execute a new promissory note for that amount, or the accused would initiate a foreclosure action against Ingle's property—the same property at issue in the mortgages that the accused had prepared on Ingle's behalf.

Eventually, the accused brought an action against Ingle's estate asserting claims for breach of contract, action on promissory notes, and judicial foreclosure of real property. The personal representative challenged Hohn's claims, arguing that some loans were barred by the statute of limitations, were unsupported by documentation, or had already been repaid. The parties ultimately settled the claims for $52,660.64.

The personal representative registered a complaint with the Bar. The Bar charged the accused with violating DR 5-105(C) (subsequently representing a client in the same or a significantly related matter as a former client when the interests of the current and former clients are in actual or likely conflict) and RPC 1.9(a) (representing a client in the same or substantially related matter as a former client in which the

---

[2] The accused did not obtain informed consent, confirmed in writing, from either the personal representative or Hohn before representing Hohn against the estate.

current client's interests are materially adverse to the interests of the former client without obtaining informed consent, confirmed in writing). The trial panel concluded that the accused violated the foregoing provisions.

B. *The Grohs Matter*

Anna Grohs purchased property from Oliver and Christie Wilde in 2003. The property consisted of four parcels. Grohs defaulted on a payment, and the Wildes initiated a foreclosure proceeding. Grohs obtained a bank loan to pay the Wildes, and the parties discussed entering into a new agreement in which the Wildes would accept the proceeds of the bank loan in exchange for releasing parcel 3.

The Wildes retained the accused to represent them in negotiating the new agreement with Grohs. In November 2004, the accused faxed Grohs a letter setting out the terms of the new agreement. The letter enclosed for Grohs's signature a Deed in Lieu of Foreclosure for parcels 1, 2, and 4 (deed on three parcels) and a promissory note for the remaining balance. In a handwritten postscript, the accused informed Grohs that, to cancel the foreclosure sale, Grohs would also need to sign a Deed in Lieu of Foreclosure on all four parcels (deed on four parcels). Apparently, the deed on four parcels was necessary to protect the Wildes in case Grohs's loan did not close. In a later fax, the accused assured Grohs that, if Grohs's loan closed, the foreclosure would be cancelled and the accused would destroy the deed on four parcels. However, if the loan did not close, the accused would record the deed on four parcels rather than the deed on three parcels.

Grohs signed and notarized the deed on four parcels. The accused immediately cancelled the foreclosure sale. Grohs's bank loan closed a few weeks later, and parcel 3 was reconveyed to Grohs.

The accused was scheduled to be away on vacation the next week. Before he left, he arranged for the Wildes to come to the office during his absence and execute the remaining documents, including the deed on three parcels. The accused reviewed the documents that the Wildes were to sign and dictated a letter to Grohs, sent the next day, informing

her that the deed on three parcels would be recorded that day.

There is no record that Grohs ever signed the deed on the three parcels. Instead, the signature page from the deed on four parcels—containing Grohs's notarized signature—was affixed to the deed on three parcels. The Wildes executed the deed on three parcels, and the deed was sent for recording. Due to unrelated errors in the paperwork, the deed was resent for recording at least two times, and was eventually recorded sometime after January 1, 2005.[3]

About two years later, Grohs discovered that her signature from the deed on four parcels had been affixed to the deed on three parcels, and she complained to the Bar. The accused responded by letter to Grohs's complaint. In that letter, the accused acknowledged that he attached the signature page from the deed on four parcels to the deed on three parcels, but asserted that he had Grohs's permission to do so:

> "Ms. Grohs was under time pressure to get her loan closed. I told Ms. Grohs by telephone that I would send her the documents. I told her that the Promissory Note did not need to be notarized, but the [deed on three parcels] did need to be notarized. I told her that, if she wanted to avoid the hassle of going to a notary again, I could use the deed she signed previously and substitute the legal description of Parcels 1, 2 and 3 in place of the legal description for Parcels 1,2,3, and 4. She agreed."

The Bar charged the accused with violating DR 1-102(A)(3) (conduct involving misrepresentation) and RPC 8.4(a)(3) (conduct involving misrepresentation that reflects adversely on the lawyer's fitness to practice law).

The accused gave sworn deposition testimony that confirmed the version of events he gave to the Bar in his letter. In that testimony, he explained:

> "All I know is, is that there was a time when we were pressured to—she was pressured. She's the one that was feeling pressure, not from me, but from wanting to salvage her

---

[3] As recorded, the deed on three parcels contained the signed and notarized signature page from the deed on four parcels, but the unsigned page from the deed on three parcels was still attached.

interest in the property, to have all the documents signed. And [there] were Fed-Ex exchanges. And somewhere in there, there was an agreement to, for time's sake, to use, since she had already signed, the [deed on four parcels]."[4]

The accused also testified that it was not Grohs's idea to switch the pages, but his own:

"No, she wouldn't have thought of that. I think that, and I'm pretty confident of this, I just think I suggested an option that I can send this to you, but guess what, it reads the same and so we could just change the legal description."

Contrary to his letter to the Bar and his deposition testimony, the accused testified at the disciplinary hearing that he first learned of the switched signature pages when the Bar informed him of Grohs's complaint against him. The accused also testified that he did not know how the signature page from the deed on four parcels became attached to the deed on three parcels. Faced with the fact that his billing records and documentation revealed no discussion with Grohs about affixing the signature page from the deed on four parcels to the deed on three parcels, the accused conceded that he had merely speculated that he and Grohs discussed saving her a trip to the notary, and that he had assumed that they discussed it because he "would not ever do anything like that without her agreement." The accused opined that his staff possibly "just mixed it up" because the accused was gone on vacation at the time and his legal assistant told him that he did not instruct her to affix the signature page from the deed on four parcels to the deed on three parcels.

---

[4] The accused contends that the Bar improperly relies on the accused's deposition testimony because the Bar did not enter the testimony into evidence, but, rather, read portions of the testimony into the record at the hearing. When the Bar read the above portion of the testimony into the record, the accused immediately responded with, "I know I prefaced that by saying, 'I don't remember this.' I'm sure if we looked back, there would have been [a] preface to that to say, 'I don't have an independent recollection of much of this at all.'" The accused thus argues that the Bar improperly relies on portions of his deposition testimony out of context.

We disagree with the accused. The accused never requested that any additional portion of the deposition testimony be read into the record to confirm that he in fact did not, at the time, recall the events he testified to in detail during his deposition. In all events, even without relying on the deposition testimony in this case, we would reach the same conclusion based solely on the accused's letter to the Bar.

The trial panel found that "the [a]ccused or someone in his office" removed the notarized signature page from the deed on four parcels, attached it to the deed on three parcels, and had it recorded. The trial panel thus concluded that the accused violated RPC 8.4(a)(3). The trial panel did not address whether the accused also violated DR 1-102(A)(3) as charged by the Bar.[5]

Based on the above violations, the trial panel concluded that the appropriate sanction in this case was a 150-day suspension.

## II. DISCUSSION

### A. *Ingle Matter*

The accused seeks review of the trial panel's decision that he violated DR 5-105(C) and RPC 1.9(a) in the Ingle matter. DR 5-105(C) prohibits an attorney, after representing a former client in a matter, from representing another client "in the same or a significantly related matter when the interests of the current and former clients are in actual or likely conflict." RPC 1.9(a) similarly prohibits an attorney, after representing a former client in a matter, from representing another person "in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless each affected client gives informed consent, confirmed in writing."

In this case, the Bar has charged that the accused's representation of Hohn, without obtaining informed consent, confirmed in writing, from the estate and Hohn, constituted a former-client conflict of interest in violation of both DR 5-105(C) and RPC 1.9(a). On review, the Bar contends that the accused represented Ingle in a matter and then later represented Hohn in the same or a substantially related matter when Ingle's surviving interests were materially adverse to Hohn's interests because of their former relationship as debtor and creditor. The accused responds that Ingle had no interests because she was deceased; the debt collection was

---

[5] The Bar pleaded violations of both DR 1-102(A)(3) and RPC 8.4(a)(3) in its second amended complaint and presented facts establishing that the accused's conduct occurred both before and after January 1, 2005. Accordingly, it appears that the trial panel's lack of a finding regarding DR 1-102(A)(3) was merely inadvertent.

not the same matter as, or substantially related to, the loan transactions; and Hohn's and Ingle's interests therefore were not materially adverse. We turn to those arguments.

1.  *Whether a deceased client is a "former client" for purposes of the former-client conflict-of-interest rules*

■ As a threshold matter, we must first determine whether it is possible for an attorney to violate the former-client conflict-of-interest rules when his or her former client is deceased. The accused essentially contends that no violation was possible because Ingle, his former client, is deceased, and, accordingly, cannot have interests adverse to Hohn, and cannot suffer injury from the subsequent representation. The Bar responds that a deceased client's interests survive his or her death. In particular, the Bar contends that, in this case, Ingle's surviving interests are expressly described in her will.

This case presents a matter of first impression in Oregon—that is, whether a former client, now deceased, is protected by the former-client conflict-of-interest rules. Oregon is not alone, as no jurisdiction appears to have directly addressed the issue. At best, a few jurisdictions have addressed the related issue of whether dissolved corporations are "clients" for purposes of the former-client conflict-of-interest rules. Those jurisdictions are split on the issue. Some jurisdictions hold that, upon a corporation's dissolution, a conflict of interest cannot exist, because the entity is "dead," no longer exists, and, accordingly, cannot have interests adverse to the current client. *See, e.g., Bagdan v. Beck*, 140 FRD 660, 667 (D NJ 1991) (holding that, because the former client of the accused (the corporation) for all intents and purposes is "dead," the former-client conflict rule does not apply). Conversely, other jurisdictions hold that a bankruptcy trustee "stands in the shoes" of the corporation as former client, and the accused in later litigation may not represent an interest adverse to the successors in interests of the failed corporation. *See, e.g., FDIC v. Berry*, No 1-85-62 (ED Tenn, June 10, 1985) (as discussed in *Bagdan*, 140 FRD at 666, with full opinion attached as Appendix Exhibit 1) (disqualifying counsel for former officers and directors of defunct corporation because those attorneys previously had represented corporation).

The other context in which courts have addressed whether a client's interests survive his or her death arises in criminal cases, in which an attorney or firm represents a criminal defendant after having previously represented the victim—now deceased—on unrelated criminal charges. *See, e.g., State ex rel S.G.*, 175 NJ 132, 134-35, 814 A2d 612, 614 (2003) (holding that a current-client conflict of interest existed when firm represented both the defendant and his victim in unrelated criminal matters, even after the victim's death, during the two-week period before the victim's matter was terminated).[6] The issue in those cases centered on whether the former representation of the victim in the unrelated criminal matter prevented constitutionally adequate representation of the criminal defendant in the subsequent criminal proceeding. That is, the issue was whether a conflict of interest created such a division of loyalty that the attorney could not provide the adequate representation of the current client that the constitution requires. Here, we must determine whether a conflict of interest exists such that the attorney violates a disciplinary rule that protects the interests of the former client. Accordingly, the two contexts are qualitatively distinct, and the former provides little guidance in answering the latter.

■    We thus turn to the former-client conflict-of-interest rules themselves to determine whether those rules' protections extend to former clients who are deceased. In interpreting a disciplinary rule, this court looks to the wording of the rule, read in context. *See In re Haws*, 310 Or 741, 746-48, 801 P2d 818 (1990) (using that methodology to interpret disciplinary rule, focusing on meaning of rule's key words). DR 5-105(C) provides, in part:

> "Except as permitted by DR 5-105(D), a lawyer who has represented a client in a matter shall not subsequently represent another client in the same or a significantly related

---

[6] *See also Mickens v. Taylor*, 535 US 162, 176-78, 122 S Ct 1237, 152 L Ed 2d 291 (2002) (Kennedy, J., concurring) (agreeing with majority's denial of ineffective assistance of counsel claim based on assertion of conflict of interest when petitioner's counsel previously represented the deceased victim; noting that, although petitioner's counsel's belief that his duty to the deceased victim ended upon the victim's death "may have been mistaken," petitioner's counsel's prior representation of the victim did not influence the choices he made during the course of the trial).

matter when the *interests* of the current and former clients are in actual or likely conflict."

(Emphasis added.) DR 5-105(D) provides an exception when "both the current client and the former client consent to the representation after full disclosure."

RPC 1.9(a) provides:

"A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the *interests* of the former client unless each affected client gives informed consent, confirmed in writing."

(Emphasis added.)

The wording of those rules focuses on the *interests* of the former client. That focus supports the Bar's position that, because a client's interests can and often do survive a client's death, the rules' protections extend to a former client even after his or her death. But it is not just any *interests* of the former client that must survive. In the context of the disciplinary rule, it is the former client's interests that pertain to the matter in which the lawyer previously represented the former client. It is those interests that must survive the former client's death.

The rules also require that the former client's interests "are" in actual or likely conflict with (DR 5-105(C)) or materially adverse to (RPC 1.9(a)) the current client's interests. Accordingly, the attorney must assess whether the pertinent interests of the deceased former client will be adverse to the interests of the subsequent client *during the subsequent representation.* That is, the proper analysis is not whether the interests of the former and current client were adverse during the former client's lifetime, but whether the surviving interests of the former client are adverse to the current client during the subsequent representation.

In sum, we conclude that, pursuant to DR 5-105(C) and RPC 1.9(a), an attorney is prohibited from engaging in a former-client conflict of interest even when the former client is deceased, as long as the former client's interests survive his or her death and are adverse to the current client during

the subsequent representation. Having determined that a deceased client may be a former client for purposes of the former-client conflict-of-interest rules, we turn to whether the Bar proved the necessary elements under those rules.

2.  *Whether the loan transaction and debt collection is the same or a substantially related matter*

The accused contends that there is no former-client conflict of interest because the loan transaction and the debt collection is not the same or a substantially related matter. The Bar disagrees. According to the Bar, the loan transaction and the debt collection are the same matter because the accused "represented Ingle's interests as borrower in entering into various obligations, including promissory notes, with Hohn" and then "sought to enforce those same obligations, but this time on behalf of Hohn, the lender." Alternatively, the Bar argues that the debt collection is substantially related to the loan transaction. Because, as explained below, we determine on this record that the loan transaction and the debt collection are both significantly and substantially related, we need not determine whether the matters are the "same."

We first consider whether the loan transactions and debt collection are "significantly related" under DR 5-105(C). Matters are "significantly related" for purposes of DR 5-105(C) if either:

> "(1)  Representation of the present client in the subsequent matter would, or would likely, inflict injury or damage upon the former client in connection with any proceeding, claim, controversy, transaction, investigation, charge, accusation, arrest or other particular matter in which the lawyer previously represented the former client; or

> "(2)  Representation of the former client provided the lawyer with confidences or secrets * * * the use of which would, or would likely, inflict injury or damage upon the former client in the course of the subsequent matter."

DR 5-105(C)(1), (2).

This court first defined the term "significantly related" in *In re Brandsness*, 299 Or 420, 430-31, 702 P2d 1098 (1985). In *Brandsness*, this court explained that

"the principle embodied in the concept of 'significantly related' matters consists of two subtests:

"*a. Matter Specific.*

"Representation of the present client in the subsequent matter would, or would likely, inflict injury or damage upon the former client in any matter in which the lawyer previously represented the former client; *or*

"*b. Information Specific.*

"Representation of the former client provided the lawyer with confidential information the use of which would, or would likely, inflict injury or damage upon the former client in the subsequent matter."

*Id.* (emphasis in original). This court clarified that matter-specific conflicts are "keyed to a particular matter," while information-specific conflicts are "based on particular information." *Id.* at 431.

When DR 5-105(C) was later promulgated, it largely codified the definition of "significantly related" that this court had formulated in *Brandsness. In re McKee*, 316 Or 114, 129, 849 P2d 509 (1993) ("[t]he new rules codified this court's holding in *In re Brandsness*"); *see also Kidney Association of Oregon v. Ferguson*, 315 Or 135, 140 n 7, 145 n 13, 843 P2d 442 (1992) (observing that DR 5-105 "since has been amended, but its effect essentially is the same," and that "changes in DR 5-105 reflect an evolution of terminology rather than substance"). Accordingly, this court's definition of "significantly related" in *Brandsness* is relevant to this court's interpretation of that term under DR 5-105(C).

The Bar contends that the matters in this case are "significantly related" because the accused engaged in a matter-specific conflict under DR 5-105(C)(1). That is, according to the Bar, "[t]o the extent there was, or even could have been, a dispute * * * as to the validity of the loans or the amounts due, the [a]ccused's pursuit of Hohn's interests would, or would likely, inflict injury or damage upon Ingle."[7]

---

[7] The Bar does not contend that the accused engaged in an information-specific conflict under DR 5-105(C)(2). That is, the Bar does not appear to contend on appeal, nor did it contend before the trial panel, that the accused's representation of Ingle provided the accused "with confidences or secrets * * * the use of which

In several cases decided before *Brandsness*, this court consistently held that a former-client conflict of interest exists when an attorney represents a former client in a transaction and then subsequently represents another client in enforcing his or her rights arising out of that same transaction. *See In re Holmes*, 290 Or 173, 182-84, 619 P2d 1284 (1980) (improper for attorney to represent former client in negotiating settlement of debt, and then represent subsequent client in suing former client to collect that same debt); *In re Brownstein*, 288 Or 83, 87, 602 P2d 655 (1980) (an attorney cannot represent a former client in a transaction and then subsequently represent another client in an attempt to enforce his or her rights arising out of that same transaction); *In re Mumford*, 285 Or 559, 561-62, 591 P2d 1377 (1979) (patent conflict of interest existed when attorneys represented husband in divorce and then, on behalf of wife's new spouse, sought to collect against husband the payments under the settlement that had been negotiated while the attorneys represented him). In articulating the test for "significantly related" matters in *Brändsness*, this court described those cases as "such egregious conflicts that we could decide them without searching for the boundary between the acceptable and unacceptable that closer cases * * * require us to locate." 299 Or at 430. Later, after DR 5-105(C) was promulgated, this court reaffirmed that, under the matter-specific-conflict subtest for "significantly related" matters, an attorney who represented a former client in a transaction may not then represent another client in enforcing his rights arising out of that same transaction. *McKee*, 316 Or at 129-30 (relying on DR 5-105(C)(1), slander of title action was "significantly related" to earlier dissolution proceeding because the accused attempted to enforce provisions of dissolution judgment that he drafted on behalf of former client).

---

would, or would likely, inflict injury or damage" upon Ingle in the course of the subsequent matter under DR 5-105(C)(2).

In any event, we note that DR 5-105(C)(2) requires that an attorney have come into actual possession of client confidences. *See id.* ("Representation of the former client *provided the lawyer with confidences or secrets * * *.*" (Emphasis added.)). There is nothing in the record in this case that suggests that the accused obtained actual possession of any confidential information in representing Ingle in the loan transactions that would, or would likely, inflict injury or damage upon Ingle in the course of representing Hohn in the debt collection.

Against that backdrop, we have no trouble concluding that the accused engaged in a matter-specific conflict in this case and, thus, the matters are "significantly related" for purposes of DR 5-105(C)(1). Here, the accused, in the loan transactions, drafted several promissory notes and mortgages on behalf of Ingle in obtaining loans from Hohn. He then, in the debt collection, subsequently represented Hohn in enforcing his rights arising out of those same documents. Such an "egregious conflict" leaves us with no doubt that the accused's representation of Hohn in the debt collection "would, or would likely" inflict injury or damage upon Ingle in connection with the loan transactions.

The accused nonetheless argues that the matters are not "significantly related," reasoning that Ingle could not be injured or damaged by the subsequent representation, because she was deceased. As noted, matters are "significantly related" under DR 5-105(C)(1) when, as pertinent here, representation of the present client in the subsequent matter "would, or would likely, inflict injury or damage upon *the former client*[.]" (Emphasis added.) The wording of that portion of the rule focuses on the former *client*, and not on the *interests* of the former client. That focus—at first blush—could support the accused's contention that, once a client is deceased, he or she could not be injured or damaged and, thus, matters could not be significantly related under DR 5-105(C). However, that definitional provision must be understood in the context of the prohibition itself, which arises when, in connection with the subsequent representation, the "interests" of the current and former client are in actual or likely conflict. Given that context, the injury or damage to the former client to which the definition necessarily refers is injury or damage to the former client's interests. Indeed, we can conceive of no other way a lawyer's representation may injure a former client than through his or her *interests*. That is, conflict of *interest* rules are just that—they protect the client's *interests*; they do not intend to protect clients from, for example, physical injury or assault. Accordingly, a deceased client may be injured within the meaning of the rule if, as previously noted, his or her surviving interests may be harmed by the subsequent representation.

In this case, Ingle's interests in the loan transactions were those of a debtor—to minimize her legal debt as much as possible as is reasonable within the bounds of the law. Those interests survived Ingle's death and were represented by her personal representative. *See* ORS 114.265 (personal representative has fiduciary duty to preserve estate with as little sacrifice of value as is reasonable under the circumstances). Ingle's will also expressly stated that she would fully pay her "just" debts. On the other hand, as the accused himself acknowledged, Hohn's goal in the debt collection was to collect "as much as possible pursuant to the promissory notes and even some loans under which there were no notes[.]" Thus, the accused's representation of Hohn "would, or would likely" injure or damage Ingle's surviving interests in the loan transactions in violation of DR 5-105(C).

■ We turn to whether the matters are "substantially related" pursuant to RPC 1.9(a). Whether the analysis under RPC 1.9(a) differs from DR 5-105(C) depends on whether the term "substantially related" differs in meaning from "significantly related." At the time of the accused's conduct, RPC 1.9(a) provided no definition of "substantially related." RPC 1.9 (2005).[8] The new rule thus did not contain the definition previously set out in DR 5-105(C).

The term was changed from "significantly related" to "substantially related" when the Oregon Rules of Professional Conduct were adopted on December 1, 2004, effective January 1, 2005. Order Adopting the Oregon Rules of Professional Conduct, Chief Justice Order No. 04-44

---

[8] The rule was amended effective December 1, 2006, to add the following definition of "substantially related":

"For purposes of this rule, matters are 'substantially related' if (1) the lawyer's representation of the current client will injure or damage the former client in connection with the same transaction or legal dispute in which the lawyer previously represented the former client; or (2) there is a substantial risk that confidential information as would normally have been obtained in the prior representation of the former client would materially advance the current client's position in the subsequent matter."

RPC 1.9(d); Order Amending Oregon Rules of Professional Conduct, Chief Justice Order No. 06-059 (Nov 16, 2006), Oregon Appellate Advance Sheets No. 26 (Dec 18, 2006) at A-19. Because the accused's conduct preceded the effective date of the amendment, that definition does not apply in this case.

(Dec 1, 2004), Oregon Appellate Advance Sheets No. 1 (Jan 3, 2005) at A-3, A-16. Although RPC 1.9 (2005) provides no commentary to explain why the term was changed from "significantly related" to "substantially related," the wording tracks that of ABA Model Rule 1.9(a). *See* ABA Model Rule 1.9(a) (2002) (former-client conflict of interest exists when matters are the same or "substantially related" and the interests of the former and current client are "materially adverse"). Before the adoption of the RPCs, Oregon's former-client conflict-of-interest rule was distinct from both the ABA Model Rule and the rule adopted in many states because it used the term "significantly related" rather than "substantially related," and it used an actual and likely conflict paradigm rather than requiring that the interests be "materially adverse." American Bar Association and Bureau of National Affairs, Inc., *ABA/BNA Lawyers' Manual on Professional Conduct* § 51:205 (2002) ("Oregon's ethics code has a unique provision on former-client conflicts" because it uses the term "significantly related" and an actual/likely conflict paradigm.). However, after the RPC was adopted, Oregon's rule became nearly identical to ABA Model Rule 1.9(a).[9]

Because RPC 1.9(a) (2005) does not define the term "substantially related," and because it tracks the text of the ABA Model Rule, we look to the commentary of the ABA Model Rules for guidance. In particular, Comment [3] to ABA Model Rule 1.9(a) (2002) provides a definition of "substantially related" for purposes of that rule:

> "Matters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."

That definition is not binding on this court, but we consider it for its persuasive value.

---

[9] The only difference between RPC 1.9(a) and ABA Model Rule 1.9(a) is that RPC 1.9(a) allows an exception if the attorney obtains informed consent, confirmed in writing, from each affected client, while ABA Model Rule 1.9(a) requires informed consent, confirmed in writing, from only the former client.

The "substantial relationship" test from the ABA Model Rule can be broken down into two subtests:

(1) whether the matters "involve the same transaction or legal dispute"; or

(2) whether there otherwise is "a *substantial risk* that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."

(Emphasis added.) In a sense, the ABA Model Rule can be characterized as dealing with matter-specific conflicts and information-specific conflicts, as did DR 5-105(C). Yet, each subtest under the ABA Model Rule appears to be broader than the subtests under DR 5-105(C).

Unlike DR 5-105(C)(1), to constitute a matter-specific conflict under ABA Model Rule 1.9(a), a risk of injury is not required; rather the matters must merely *involve* the same transaction or legal dispute. The main concern appears to be disloyalty to the former client. *ABA/BNA Lawyers' Manual on Professional Conduct* § 51:226. It is generally, if not universally, accepted that a "current representation adverse to a former client is substantially related to the earlier representation if it involves the lawyer's own work for the former client—especially an attack on that work." *Id.*; *see also Restatement of Law Governing Lawyers* § 132(1) (2000) (a current matter is substantially related to an earlier matter if "the current matter involves the work the lawyer performed for the former client").

To constitute an information-specific conflict under ABA Model Rule 1.9(a), unlike DR 5-105(C)(2), actual possession of client confidences is not necessary. *See* discussion 348 Or at 586-87 n 7 (explaining that DR 5-105(C)(2) requires actual possession of client confidences). Rather, it is enough if there is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter. The ABA Model Rule protects the former client from having to reveal the confidential information learned by the lawyer. The focus thus is on the risk of information gained "based on the nature of the services the lawyer provided the former client and information that would in

ordinary practice be learned by a lawyer providing such services." Comment [3] to ABA Model Rule 1.9(a); *see also* Richard E. Flamm, *Lawyer Disqualification: Conflicts of Interest and Other Bases* § 8.4, 148 (2003) (policy against requiring former client to show precisely what confidences were used against her includes avoiding extensive inquiries into privileged areas).

As previously noted, the Bar did not argue that the accused came into actual possession of client confidences. Neither did it argue that the accused's conduct created a *substantial risk* that confidential factual information as would normally have been obtained in the prior representation would materially advance Hohn's position in the subsequent representation. We thus confine our focus on whether the matters are "substantially related" under RPC 1.9(a) based on whether the accused engaged in a matter-specific conflict. We conclude that they are. The debt collection and loan transactions certainly *involved* the same transaction—the underlying loan documents that the accused drafted on behalf of Ingle. The accused's representation of Hohn involved his own work that he had completed on behalf of Ingle and, in that regard, the matters are substantially related.[10] We therefore determine that the accused engaged in a matter-specific conflict in violation of RPC 1.9(a).

3. *Whether Ingle's surviving interests were adverse to Hohn's interests during the subsequent representation*

■     A conflict of interest exists under RPC 1.9(a) when the current client's interests "are materially adverse to the interests of the former client." A conflict of interest exists

---

[10] The accused disagrees and contends that, to establish a matter-specific conflict pursuant to RPC 1.9(a), the Bar is required to prove *actual* injury—that is, the Bar is required to prove that the estate paid more than the fair value of Hohn's claims as a result of the accused's representation of Hohn. The accused's premise and conclusion are incorrect. The accused relies on language in RPC 1.9(d)(1) (matters "substantially related" if the lawyer's representation of the current client "will injure or damage the former client"), a subsection of the rule that, as noted, 348 Or at 589 n 8, was not adopted until after the accused engaged in the conduct at issue. We therefore decline to address the accused's argument in that respect.

under DR 5-105(C) when the interests of the current and former clients "are in actual or likely conflict." An "actual conflict of interest" exists when "the lawyer has a duty to contend for something on behalf of one client that the lawyer has a duty to oppose on behalf of another client." DR 5-105(A)(1). A " 'likely conflict of interest' exists in all other situations in which the objective personal, business or property interests of the clients are adverse." DR 5-105(A)(2). "A 'likely conflict of interest' does not include situations in which the only conflict is of a general economic or business nature." *Id.* So framed, the analysis under RPC 1.9(a) and DR 5-105(C) is not materially distinct.

The Bar contends that Ingle's surviving interests and Hohn's interests were *per se* materially adverse and patently in conflict due to their former relationship as debtor and creditor. We agree. As previously discussed, Ingle's interests in the loan transactions as debtor—*i.e.*, to minimize her legal debt as much as reasonably possible within the bounds of the law—survived Ingle's death and were represented by her personal representative. 348 Or at 589. On the other hand, Hohn's interests as creditor in the debt collection were to maximize the amount that Ingle owed under the loans as much as was reasonable within the bounds of the law and to collect as much of that amount as possible. Those interests are "different" and "adverse." *See In re Wittemyer*, 328 Or 448, 455, 980 P2d 148 (1999) (conflict of interest existed when a lawyer represented both the lender and borrower in a loan transaction); *In re Moore*, 299 Or 496, 506, 703 P2d 961 (1985) (debtor and creditor had different interests). Thus, Ingle's surviving interests and Hohn's interests were in likely conflict and materially adverse during the subsequent representation.

The accused disagrees, contending that Ingle's and Hohn's interests were not adverse because the Bar failed to prove that Hohn actually sought to collect on any loans that were not "just." According to the accused, the Bar's assertions that Hohn sought to collect on undocumented loans or loans beyond the statute of limitations are not supported by the record.

The accused conflates "adversity" with "injury." The rules against conflicts of interest require an attorney to assess whether the interests of the former and prospective new client are adverse at the time the attorney seeks to undertake the subsequent representation. Ingle's surviving interests and Hohn's interests as debtor and creditor were adverse from the outset. Whether the subsequent representation ultimately caused actual injury to Ingle is an inquiry relevant to sanctions, and not to whether Ingle and Hohn's interests are adverse or in conflict. *See* American Bar Association's Standards for Imposing Lawyer Sanctions 7 (1991) (amended 1992) (ABA Standards) (defining actual and potential injury for purposes of sanctions).

In sum, we find that the debt collection was significantly and substantially related to the loan transactions and Hohn's interests were in likely conflict with and materially adverse to Ingle's surviving interests during the subsequent representation. We therefore conclude that the accused violated both DR 5-105(C) and RPC 1.9(a) in the Ingle matter.

## B. *Grohs Matter*

■ The Bar alleged that the accused engaged in misrepresentation in violation of DR 1-102(A)(3) and RPC 8.4(a)(3) when the accused removed Grohs's signature page from the deed on four parcels, attached it to the deed on three parcels, and then recorded the altered deed. As noted, the trial panel concluded that the accused violated RPC 8.4(a)(3), but did not address DR 1-102(A)(3). The accused seeks review of the trial panel's decision that he violated RPC 8.4(a)(3). On *de novo* review, we consider whether the accused's conduct violated either rule as alleged.

DR 1-102(A)(3) provides: "It is professional misconduct for a lawyer to * * * [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" RPC 8.4(a)(3) provides: "It is professional misconduct for a lawyer to * * * engage in conduct involving dishonesty, fraud, deceit or misrepresentation that reflects adversely on the lawyer's fitness to practice law[.]"

■■ A lawyer engages in conduct involving misrepresentation when the lawyer makes a representation, either

directly or by omission, that the lawyer knows is false and material. *In re Davenport*, 334 Or 298, 308, 49 P3d 91, *adh'd to as modified on recons*, 335 Or 67, 57 P3d 897 (2002). "A lawyer acts knowingly by being consciously aware of the nature or attendant circumstances of the conduct, but not having a conscious objective to accomplish a particular result." *In re Lawrence*, 332 Or 502, 513, 31 P3d 1078 (2001). A misrepresentation is material if it "would or could significantly influence the hearer's decision-making process." *In re Eadie*, 333 Or 42, 53, 36 P3d 468 (2001). The accused does not dispute that, if he knowingly attached the signed and notarized signature page from the deed on four parcels to the deed on three parcels and sent it for recording, that such representation was false and material. Neither does the accused dispute that such misrepresentation would reflect adversely on his fitness to practice law. Rather, the accused's sole contentions are that the Bar failed to establish, by clear and convincing evidence, that he acted (1) through direct, personal conduct, or (2) with a knowing state of mind.

First, the accused contends that there is "no evidence—and certainly not clear and convincing evidence—of direct, personal conduct." (Capitalization omitted.) The trial panel concluded that the accused "acquiesced [in] the removal of the notarized signature page" from one deed and had it placed on a second deed. According to the accused, that conclusion is contradicted by the trial panel's "either/or" finding that "the Accused *or someone in his office*" (emphasis added) removed the signature page from the deed on four parcels and affixed it to the deed on three parcels. The accused thus contends that the trial panel's "either/or" finding of fact cannot support a conclusion by clear and convincing evidence that there was any personal misconduct by the accused.

Second, the accused contends that there is no clear and convincing evidence that the accused acted with the requisite *mens rea* of "knowledge." The accused argues that "[a]ll the evidence points to a mistake by [the accused]'s office in the filing[.]"

The Bar disagrees and contends that the accused acted both personally and with the requisite knowledge. The

Bar relies principally on the accused's letter in response to the Bar and his deposition testimony, in which the accused was "clear and unequivocal" that he personally made the substitution after consulting with Grohs. According to the Bar, although the accused later changed his story and claimed that he had no idea how the signature page on the deed on four parcels became attached to the deed on three parcels, the trial panel considered the disparate versions provided by the accused and rejected the new version.

The question of what the accused actually knew thus hinges on whether this court believes the accused's letter in response to the Bar and deposition testimony under oath, or his later equivocations and retractions. This court gives weight to the trial panel's express credibility assessments. *In re Gustafson*, 333 Or 468, 470, 41 P3d 1063 (2002). More specifically,

> "[w]hen a panel's assessment is based on the objective factors involving the intrinsic believability of competing inferences or evidence—*e.g.*, the inherent improbability of certain testimony, the existence of corroboration, and so on—this court owes no deference to that assessment, but the panel's discussion may be enlightening and have persuasive force. When the panel's assessment is based on subjective observations of a witness's demeanor and the manner in which the witness testifies, the trial panel explicitly should state that its findings are demeanor-based, because this court appropriately defers to the trial panel's superior position to assess credibility on that basis."

*In re Fitzhenry*, 343 Or 86, 103 n 13, 162 P3d 260 (2007).

The trial panel in this case found that the accused's trial testimony varied from his letter of explanation to the Bar and from what was contained in his deposition. The trial panel also found that Grohs was credible in all her testimony and expressly concluded that, where her testimony differed from that of the accused, Grohs was to be believed. The trial panel did not, however, make other express demeanor-based findings.

In contrast to the version of events given by the accused in his letter to the Bar and deposition testimony,

Grohs testified at the hearing that she never had a conversation with the accused about attaching her signature from the deed on four parcels to the deed on three parcels. The trial panel found that testimony to be credible, but made no demeanor-based findings. Accordingly, we owe no deference to that assessment. *Fitzhenry*, 343 Or at 103 n 13. However, Grohs's testimony is corroborated by the accused's billing records and documentation, which do not support that she had such a conversation with the accused. We thus find the panel's credibility finding, based on those objective factors, to have persuasive force. *Id.* The accused's previous claim in his letter to the Bar and his deposition testimony that he had permission from Grohs to affix the signature page from the deed on four parcels to the deed on three parcels is not credible.[11]

However, that finding undermines only the accused's original proffered *reason* for attaching the signature page from the deed on four parcels to the deed on three parcels, not his concession that he knew about the signature page switch. As noted, in his letter to the Bar, the accused represented that he sought and received Grohs's permission to "use the deed she signed previously and substitute the legal description of [the deed on three parcels] in place of the legal description for [the deed on four parcels]." That representation to the Bar establishes the accused's knowledge of the signature page switch, whether he or someone in his office personally switched the pages. When the accused later testified before the trial panel that he did not know how the signature page became affixed, his only proffered explanation for the discrepancy in his version of events was that he had no recollection of switching the pages, but merely had speculated that he discussed saving Grohs a trip to the notary, because he "would not ever do anything like that

---

[11] The accused's reason for gaining Grohs's permission also does not hold up factually. The accused claimed in his letter to the Bar and deposition testimony that Grohs was under time pressure to get her loan closed. However, Grohs's loan had already closed several days before the signature pages were switched.

Furthermore, whether the accused had Grohs's permission to alter and record the deed is irrelevant. The misrepresentation occurred in this case when, by recording the document, the accused knowingly made a false representation that Grohs signed the deed on three parcels when, in fact, she had signed and notarized a separate and distinct legal document—the deed on four parcels.

without her agreement." Given that the accused immediately admitted in his letter to the Bar that he was "consciously aware" of the circumstances surrounding the signature page switch to the Bar, we find that he had the requisite knowledge that the notarized signature page from the deed on four parcels was removed and affixed to the deed on three parcels.

Accordingly, the Bar established by clear and convincing evidence that the accused acted with knowledge. Thus, the trial panel correctly concluded that the accused violated RPC 8.4(a)(3). The Bar also proved by clear and convincing evidence that the accused violated DR 1-102(A)(3).

## III. SANCTION

Having found that the accused violated the disciplinary rules charged, we must determine the appropriate sanction. The trial panel concluded that the appropriate sanction was a 150-day suspension. On review, the accused challenges the trial panel's sanction, and argues that, at most, a reprimand is warranted. We have reviewed the trial panel's conclusions with regard to the sanction and, as we explain below, we conclude that a 150-day suspension is appropriate.

The purpose of lawyer discipline is not to penalize the accused. *In re Glass*, 308 Or 297, 304, 779 P2d 612 (1989). Rather, the purpose is to "protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to properly discharge their professional duties to clients, the public, the legal system, and the legal profession." ABA Standard 1.1.

■ In determining an appropriate sanction for a lawyer's violations of the rules, we follow the analytical framework that this court has set out in past cases. Under that framework, we determine an initial presumptive sanction based on (1) the ethical duty violated, (2) the lawyer's mental state, and (3) the actual or potential injury caused. *See, e.g., In re Jaffee*, 331 Or 398, 408, 15 P3d 533 (2000) (articulating methodology). We then adjust that presumptive sanction based on a fourth factor—the presence of aggravating or mitigating circumstances. *Id.* at 408-09. Finally, we consider whether that adjusted sanction is consistent with Oregon case law. *Id.* at 409.

## A. *Preliminary Analysis*

The accused has violated multiple rules in this matter. The violations breached the accused's duties to his clients and to the public. ABA Standard 4.3 (failure to avoid conflicts of interest violates duty owed to clients); ABA Standard 5.1 (engaging in misrepresentation violates duty owed to public to maintain personal integrity); *see also In re Knappenberger*, 338 Or 341, 356, 108 P3d 1161 (2005) ("[a] lawyer's most important ethical duties are those owed to clients, including the duty to avoid conflicts of interest"); *In re Spencer*, 335 Or 71, 86, 58 P3d 228 (2002) (by engaging in conduct that involved dishonesty and misrepresentation, the accused violated his duty to the public to maintain his personal integrity).

The ABA Standards recognize three mental states: intentional, knowing, and negligent. A lawyer acts with "intent" if he or she acts with "the conscious objective or purpose to accomplish a particular result." ABA Standards at 7. A lawyer acts with "knowledge" if he or she acts with "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Id.* "Negligence" is "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." *Id.*

Here, as for the violations in the Ingle matter, based on our *de novo* review of the record, we conclude that the accused violated DR 5-105(C) and RPC 1.9(a) knowingly. The accused represented Ingle in obtaining a series of loans from Hohn and drafted the documents to evidence and secure those loans. It is undisputed that the accused knew both that Hohn was Ingle's lender in those loan transactions and that Hohn, in the subsequent representation, was seeking to enforce his rights arising out of the very documents that the accused had drafted on behalf of Ingle in the prior representation. Furthermore, the accused testified at the hearing that he was aware that Hohn's interest was "in getting as much as possible pursuant to the promissory notes and even some loans under which there were no notes[.]" In that respect, we

conclude that the accused was consciously aware of the nature or attendant circumstances of the conduct underlying the violations in the Ingle matter.

As to the Grohs matter, the trial panel necessarily found that the accused acted with knowledge when it determined that the accused violated RPC 8.4(a)(3). As we previously explained, based on our own *de novo* review of the record, we agree with the trial panel that the accused violated RPC 8.4(a)(3) knowingly, and we also conclude that the accused violated DR 1-102(A)(3) knowingly. 348 Or at 597-98.

Under the ABA Standards, the injuries caused by a lawyer's professional misconduct may be either actual or potential. *See In re Williams*, 314 Or 530, 547, 840 P2d 1280 (1992) ("[A]n injury need not be actual, but only potential, in order to support the imposition of a sanction."). Actual "injury" is actual harm to a client, the public, the legal system, or the profession that is caused by a lawyer's misconduct. ABA Standards at 7. "Potential injury" is harm that is reasonably foreseeable at the time of the lawyer's misconduct but that ultimately did not occur. *Id.*

As to the Ingle matter, there was potential injury to the public and the profession. *See In re McMenamin*, 319 Or 609, 621, 879 P2d 173 (1994) (Graber, J., dissenting) (potential for injury to public and profession exists because, "when lawyers have conflicts of interest, they jeopardize the willingness of clients to disclose fully their confidences and thereby jeopardize the ability of clients to obtain the most effective legal representation possible"). There was also *potential* injury to Ingle's interests, but not actual injury to them. Although the estate expended monetary resources in defending the claim against certain "unjust" claims (*i.e.*, Hohn's claims to collect on loans unsupported by notes and claims beyond the statute of limitations), the estate would have had to do so regardless of who had represented Hohn. *See In re Campbell*, 345 Or 670, 688, 202 P3d 871 (2009) (injury to former client included *potential* economic harm, not *actual* economic harm, because former client would have been required to employ a lawyer even if the accused had not also represented subsequent clients).

Regarding the Grohs matter, we conclude that, although it does not appear that the Wildes suffered any actual injury, there was potential injury to the Wildes, because proper claim of title to the properties could potentially be in dispute due to the altered deed. There also is potential serious injury to the legal system, the profession, and to the public when, as here, a lawyer engages in misrepresentation that reflects adversely on the lawyer's fitness to practice law. *In re Paulson*, 346 Or 676, 716, 216 P3d 859 (2009), *adh'd to as modified on recons*, 347 Or 529, 225 P3d 41 (2010).

The ABA Standards provide that suspension is the appropriate sanction for each of the accused's violations of RPC 1.9(a) and DR 5-105(C). *See* ABA Standard 4.32 (suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes potential injury to a client). Reprimand is generally an appropriate sanction for each of the accused's violations of RPC 8.4(a)(3) and DR 1-102(A)(3). *See* ABA Standard 5.13 (reprimand is generally appropriate when a lawyer knowingly engages in conduct that involves misrepresentation and that adversely reflects on the lawyer's fitness to practice law). Because suspension is the greater of the two sanctions, suspension is the appropriate preliminary sanction here.

B. *Aggravating and Mitigating Circumstances*

We next consider any aggravating and mitigating circumstances. We find three aggravating circumstances in this case. First, the accused committed multiple offenses. ABA Standard 9.22(d). Second, having been licensed to practice law in Oregon since 1978, the accused has substantial experience in the practice of law. ABA Standard 9.22(i). Finally, the accused has prior disciplinary offenses. ABA Standard 9.22(a). Specifically, in 1997, the accused was suspended from the practice of law for 90 days for violating DR 1-102(A)(3) (engaging in conduct involving dishonesty), DR 5-104(A) (entering into a business transaction with a client without consent after full disclosure), and ORS 9.527(4) (willful deceit or misconduct in the legal profession). *In re Hostetter*, 11 DB Rptr 195 (1997). In 2001, the accused was admonished

for engaging in a current-client conflict of interest in violation of DR 5-105(E).

■ The accused disputes that the 2001 letter of admonition is appropriately considered as a prior disciplinary offense. We disagree. In *In re Cohen*, 330 Or 489, 500-01, 8 P3d 953 (2000), this court explained that it ordinarily would not consider a letter of admonition as a prior disciplinary offense if the admonition involved misconduct "wholly different in nature from the misconduct at issue in the case at bar," but would do so if it involved the "same or similar type of misconduct as that presently at issue." The accused was admonished in 2001 because he violated DR 5-105(E) (current-client conflict of interest). Specifically, the State Professional Responsibility Board found that the accused represented clients in a subdivision matter at the same time that the accused's firm was representing another client in lease negotiations (and then a dispute) with those same clients. That misconduct is not "wholly different in nature from the misconduct at issue" in this case but, rather, is similar in type and violates the same duty—the duty owed to his clients. *See* ABA Standard 4.3 (failure to avoid conflicts of interest violates duty owed to client).

Two mitigating factors are also present. The accused had a cooperative attitude toward the disciplinary proceedings. ABA Standard 9.32(e). The accused also appears to have an excellent reputation in the community. ABA Standard 9.32(g).

C. *Oregon Case Law*

■ Having made a preliminary determination that a suspension of some term is appropriate based on the ABA Standards and the aggravating and mitigating factors, we turn to this court's case law to help us determine the duration of that suspension. As we have noted in the past, case-matching in the context of disciplinary proceedings "is an inexact science." *In re Stauffer*, 327 Or 44, 70, 956 P2d 967 (1998). That is especially so for cases involving multiple violations in multiple matters, because in many such proceedings the accused declines to contest the charges or the sanction. *Paulson*, 346 Or at 721. Still, we think that this court's past cases do provide some guidance, and that they demonstrate the appropriateness of the suspension in this case.

As this court has explained on several occasions, a finding that a lawyer has engaged in a conflict of interest in violation of DR 5-105, standing alone, typically justifies a 30-day suspension. *Campbell*, 345 Or at 689; *see also Knappenberger*, 338 Or at 361 (court ordinarily suspends lawyers who violate DR 5-105(C)); *In re Hockett*, 303 Or 150, 164, 734 P2d 877 (1987) (30-day suspension appropriate for single violation of DR 5-105(C)). Here, however, the accused not only engaged in a conflict of interest, but also engaged in misrepresentation that reflects adversely on his fitness to practice law.

In previous lawyer disciplinary cases involving dishonesty and misrepresentation, this court has ordered sanctions ranging from six-month suspensions to disbarment. *In re Wilson*, 342 Or 243, 251, 149 P3d 1200 (2006); *see, e.g.*, *In re Benson*, 317 Or 164, 854 P2d 466 (1993) (six-month suspension for assisting client in preparation of fraudulent documents); *In re Hawkins*, 305 Or 319, 751 P2d 780 (1988) (disbarment for filing false affidavit and using false evidence); *In re Brown*, 298 Or 285, 692 P2d 107 (1984) (two-year suspension for preparation of false affidavit).

*In re Morris*, 326 Or 493, 953 P2d 387 (1998), is particularly instructive here. In that case, this court concluded that the accused violated, *inter alia*,[12] DR 1-102(A)(3) when she knowingly altered and filed with the court a final account that had been previously signed and notarized by her client. 326 Or at 495, 501-02. This court also concluded that the accused violated DR 5-105(E) (representing multiple current clients when such representation would result in an actual or likely conflict) when the accused simultaneously represented the prior and successor personal representatives of an estate. 326 Or at 495, 503-04. After determining that the accused's violation of DR 5-105(E) was "both obvious and serious," but also finding that the "mitigating factors significantly outweigh[ed] the aggravating factors," this court imposed a sanction of 120 days. 326 Or at 505-06.

Here, as in *Morris*, the accused's violation of the conflict of interest rules was "obvious and serious." Furthermore,

---

[12] This court also found that the accused violated DR 7-102(A)(5) (in lawyer's representation of client, knowingly making a false statement of law or fact) and DR 1-102(A)(4) (conduct prejudicial to the administration of justice). 326 Or at 495.

the aggravating factors in this case militate in favor of a sanction greater than the 120-day sanction imposed in *Morris*. Accordingly, a 150-day suspension is appropriate in this case.

## IV. CONCLUSION

Having found, as did the trial panel, that the accused violated DR 5-105(C), RPC 1.9(a), and RPC 8.4(a)(3), as well as DR 1-102(A)(3); having considered the relevant ABA Standards; and having evaluated the applicable Oregon case law, we determine that the appropriate sanction for the accused's violations in this matter is a 150-day suspension.

The accused is suspended from the practice of law for 150 days, commencing 60 days from the date of the filing of this decision.